IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

BILLIE L. REDDING,

               Plaintiff,

    vs.

PROSIGHT SPECIALTY
MANAGEMENT COMPANY, INC.
aka MUTUAL MARINE OFFICE,
INC., PROSIGHT SPECIALTY
INSURANCE GROUP, INC. aka
NYMAGIC, INC., and NEW YORK
MARINE AND GENERAL
INSURANCE COMPANY,

           Defendants.

CV 12–98–H–CCL

OPINION & ORDER

Summary of Case

[Insurer delivered policy limits of $4 million to Linda Deola,
attorney for Plaintiff Redding, and six other plaintiffs to settle
prior case against accounting firm Anderson ZurMuehlen.
Redding alone by Deola as counsel now sues insurer for bad
faith failure to timely settle prior case. Plaintiff is unable to
explain her claim in deposition. Deola is disqualified as
counsel here so she could testify as a necessary witness to facts
in the prior case. Co-counsel, partner Brian Miller, takes over
case. Onerous discovery violations and other bad faith by
Plaintiff's counsel. Attempted disqualification of judge is
denied. Held: Summary judgment for insurer with award of
attorney fees and costs against counsel Deola and Miller.]

This is an unusual third-party bad faith insurance case. It is best understood divided into three distinct phases or segments of litigation, and the Court sets forth at some length and in some detail this extraordinary background before addressing multiple pending motions.

First Phase--Underlying Tort Litigation

The first phase began with Plaintiff Billie Redding's 2009 tort claim against the Anderson ZurMuehlen & Co., P.C. ("AZ") accounting firm. Plaintiff Redding was a long-time client of AZ, receiving traditional accounting services and tax advice. AZ had created a subsidiary called "AZ Real Estate & Business Brokerage," doing business as "Acquiron, LLC." In 2004, Plaintiff Redding wanted to dispose of her substantial ranch and replace it with a stream of income, but she would be faced with approximately $1.5 million in income taxes. Her AZ accountant referred her to Acquiron for a possible I.R.C. §1031 property exchange that would allow her to avoid this tax penalty. Acquiron advised her to consider a §1031 exchange of her ranch for tenancy-in-common shares ("TICs") of commercial properties sold by DBSI. The Internal Revenue Service had approved DBSI TICs as a suitable vehicle for §1031 exchanges. In addition to avoiding taxes, Redding was to receive payments of $13,000 per month increasing over a ten year period to $22,000 per month. With the advice of her personal attorney,

2

Redding decided to participate in this transaction. Unfortunately, four years later DBSI declared bankruptcy, and Redding's monthly payments became irregular and eventually stopped.

Acquiron also recommended the same or a similar transaction for at least six other substantial ranch clients, who likewise each suffered the loss of their monthly rental payments in 2008 or 2009. On November 11, 2008, the day after DBSI declared bankruptcy, AZ reported to its insurer, New York Marine and General Insurance Co. ("NYM"), that there was a potential for multiple claims made against AZ and Acquiron by their clients. Redding filed suit in state court against AZ, Acquiron, her AZ accountant, and two Acquiron employees in 2009. The other six claimants filed suit against AZ and the others in 2010, 2011, and 2012. Although one suit was filed in 2010, it was not served on AZ until late 2011. Redding alleged in her complaint that her TICs were actually unregistered securities and that AZ and Acquiron and their employees had violated the Securities Act of Montana, MCA §§ 30-10-101 *et seq.*, and had committed fraud and misrepresentation in connection with the sale of the TICs as unregistered securities. The applicable insurance policy (discussed below) contained an exclusion for claims arising from the brokerage of unregistered securities.

In January, 2011, discovery was ongoing in Redding's case, and AZ's

defense lawyers were planning and preparing summary judgment motions as to whether the statute of limitations had expired for the securities claim and whether the TICs were securities. AZ's defense lawyers also believed that Redding's $4.6 million in claimed damages were inflated by the fact that she had not reported all of her previously received rental income from her TICs and the fact that she claimed over $2 million in damages from non-recourse mortgage debt that she had acquired in the transaction but that (allegedly) she would never be required to repay.

On February 17, 2011, before a summary judgment motion had been filed, Redding made a demand for the $2 million policy limit applicable to her claim. At that time, a March 23rd mediation conference was already scheduled. Defendants responded to the policy limit demand by requesting that the 30-day response period be extended a few days to include the day of the mediation conference. Defendants also explained that they had not yet received an expert's report as to damages and were waiting for more information to evaluate Plaintiff's damages. Plaintiff rejected Defendant's request for an extension, and the 30-day demand expired.

The March 23, 2011, mediation conference was held as scheduled, and Stuart Kellner served as the mediator. Defendants opened with an offer of

$250,000, hoping to arrive at a final settlement of somewhere between $750,000 and $900,000. Redding counter-offered with $6.5 million, which was more than three times the policy limit. Mediator Kellner decided that the mediation would not be successful that day, so he terminated the mediation.

In August 2011, a state district court ruled on AZ's summary judgment motion as to the securities issue, ruling in AZ's favor that Redding's DBSI TICs were not securities. In response, Redding filed a petition for writ of supervisory control in the Montana Supreme Court, which heard oral argument in late April, 2012, and ruled on July 5, 2012. The Montana Supreme Court held that the DBSI TICs were securities and remanded the case to the district court for further proceedings.

However, in June 2012, before the Montana Supreme Court had even issued its decision on July 5, Redding and the six other claimants settled their lawsuits against AZ in a global settlement for $4.65 million. NYM contributed $4 million to the settlement from AZ's 2008 and 2010 policies, and AZ contributed $650,000 (which represented AZ's commissions or fees). Redding's share of the global settlement (after payment of her attorney fees and costs) was $450,844.87.

AZ was represented in the Underlying Litigation by a Montana law firm, Milodragovich, Dale, Steinbrenner & Nygren, P.C. ("MDS"), and specifically by

5

two MDS attorneys, G. Patrick HagEstad and Brad Condra.  Plaintiff Redding was represented by Richard "Mike" Layne of Portland, Oregon, and Linda Deola, of Helena, Montana.  After filing Redding's complaint in 2009, Deola subsequently acquired the five other clients and, as sole counsel for each, served their complaints in 2011 and 2012.[1]  The seventh claimant, Garrison Ranches Inc., was represented by John Bloomquist.

The record in this case does not reflect that Redding gave informed consent to the multiple representations of Ms. Deola's five other clients.  Redding later testified in her deposition that she did not find out that the other claimants existed until the insurance money was divided.  (Doc. 259-14, Redding Depo. 65:14-17; 75:18-25.)  It is not clear even now that Redding understands that Deola was retained by those other claimants for the purpose of sharing the same limited insurance proceeds that Redding was hoping would be hers alone.  Redding was surprised at the time of settlement when she found out that other people were involved.  (Doc. 259-14, Redding Depo. 94:18-95:17.)  She testified that, at first,

_____

[1] *Thieltges, et al. v. Anderson ZurMuehlen & Co., P.C., et al.*, Montana First Judicial District Court Case No. DDV 2011-346; *Chevallier Ranch Co. v. Anderson ZurMuehlen & Co., P.C., et al.*, Montana First Judicial District Court Case No. BDV 2011-535; *Buckingham and Bailey v. Anderson ZurMuehlen & Co., P.C., et al.*, Montana First Judicial District Court Case No. BDV 2011-1115; and *Schindler Livestock v. Anderson ZurMuehlen & Co., P.C., et al.*, Montana First Judicial District Court Case No. BDV 2012-446.

she didn't realize that the $4.65 million was for everybody; she hoped that sum would be used to compensate her alone. (Doc. 259-14, Redding Depo. 96:2-10.) Even at the time of her deposition in this case, Redding seemed not to understand that she and all of Deola's other clients were sharing one finite pot of insurance money. (Doc. 259-14, Redding Depo. 67:11-21.) Instead, Redding believes that she is now suing NYM because it has not yet paid her "bill" in full. (Doc. 259-14, Redding Depo. 148:3-10 ("You [NYM] are not paying your bills.... My bill.... See, it keeps adding up. It is drawing interest.").)

In other words, Redding's contention seems to have been that she was in competition with Deola's other five clients for their respective shares of an inadequate sum certain.

Ms. Redding's testimony has caused concern about compliance with the rules regarding representation of multiple clients. Rule 1.7, Montana Rules of Professional Conduct, requires a lawyer to refrain from taking on a new representation when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client...." Rule 1.7(a)(2), Mont. R. Prof. Conduct. Such multiple-client representations may go forward if four conditions can be met, including the condition that "each affected client gives informed consent, confirmed in writing."

Rule 1.7(b)(4), Mont. R. Prof. Conduct.  The entire record does not demonstrate that this condition was met.

## Second Phase--Underlying Coverage Litigation

After Redding's complaint was filed in 2009, NYM agreed to defend AZ against Redding's claim, but under a reservation of its right to deny coverage based on exclusions under the policy. The 2008 policy pertinent to Redding's claim had a liability limit (per claim and aggregate) of $2,000,000.  In its reservation of rights letter, NYM noted that the 2008 policy excluded claims based on criminal, dishonest, or fraudulent acts or omissions, deliberate misrepresentations, or intentional or knowing violations of law.  The 2008 policy also excluded claims arising from AZ or Acquiron's capacity as a broker or dealer in securities.

Because the facts underlying Redding's complaint were still being discovered and issues were being defined by motion practice in Redding's state court case, no further action was taken by NYM as to coverage.  It was particularly significant to the coverage case, and favorable to AZ, that the state district court decided that Redding's TICs were not securities.  Four months after the state district court ruled in AZ's favor on partial summary judgment, AZ's coverage attorney, Curt Drake, filed a declaratory judgment action on AZ's behalf against

NYM in December, 2011, seeking a declaration of coverage under AZ's insurance policy. AZ's coverage complaint also named as co-defendants three of the claimants as "stakeholders" in the coverage dispute: Redding, Chevallier Ranch Company, and Richard Thieltges and Thieltges Farms. This coverage action was removed to federal court in April, 2012, and was assigned to the undersigned. *See Anderson ZurMuehlen & Co. P.C. v. New York Marine & General Ins. Co.*, Case No. 6:12cv35-CCL. Because AZ settled with all the claimants shortly after removal, this coverage case was never adjudicated on the merits. Five months after settlement, on November 28, 2012, the parties stipulated to dismissal of the coverage case, and the Court dismissed the case with prejudice on December 11, 2012.

That declaratory judgment action had sought a ruling that NYM owed a duty to indemnify AZ under the applicable NYM insurance policies. (NYM was already defending.) There were serious factual and legal questions in the coverage lawsuit, the adjudication of which would have determined whether there was $4 million of coverage available on two policies, $2 million of coverage on one policy, no coverage at all under either policy, or only partial coverage for some claims and not others on one or more policies. Both of the policies at issue, the 2008 policy and the 2010 policy, were professional insurance policies that

explicitly provided that before NYM could settle a claim, the insured AZ had to consent, in writing, to the settling of the claim. (Doc. 253-1 at 20.) These were also "claims made and reported" policies, *i.e.*, after the first claim was made, subsequent related claims were to be deemed submitted under the original policy year. While there would only be one deductible for all related claims, all related claims would be limited by the aggregate coverage available ($2 million) under the original policy year. (Doc. 253-1 at 21.) Of particular importance to AZ, the insurance policy excluded coverage of securities transactions and criminal, dishonest, or fraudulent acts or deliberate misrepresentations or intentional or knowing violations of the law. (Doc. 253-1 at 3,22.)

AZ was represented in this coverage litigation by Curt Drake. NYM retained Robert Guite of the Squire Sanders law firm in San Francisco to represent it in the coverage litigation, and he remained the sole attorney of record for NYM until that case was dismissed on December 11, 2012. *See Anderson ZurMuehlen & Co. P.C. v. New York Marine & General Ins. Co.*, Case No. 6:12cv35-CCL (Doc. 16, Order of Dismissal dated December 11, 2012). Linda Deola represented co-defendants Redding, Chevallier Ranch Company, and Richard Thieltges and Thieltges Farms.

<u>Third Phase--Bad Faith</u>

The third phase is the instant case involving a bad-faith insurance complaint filed by Redding, represented solely by Ms. Deola, in state district court against NYM. The case was removed to this Court in October, 2012. In this case, Redding has alleged, among other things, that NYM acted in bad faith in its settlement of her claim.

Ms. Deola apparently expected to find evidence that would prove NYM's bad faith in its handling of Redding's claim against AZ. Redding's counsel apparently believed that NYM prevented AZ from settling her case much earlier than it settled. Ms. Deola testified in her deposition that "AZ had been telling me all along, we want to settle this case, it's New York Marine that's not putting up the money, they are the problem, not AZ." (Doc. 259-1, Deola Depo. II 83:21-24; 103:5-19.) The record clearly establishes AZ did not decide to settle with Redding until just days or weeks before it entered into its settlement agreement with Redding. (Doc. 259, Carlson Depo. I, 29:9-17; 32:3-13, 38:20-39:18.) Indeed, before June 15, 2012, there was no written request or consent from AZ to NYM (as was required by the insurance policy) that notified or requested NYM to settle Redding's claim against AZ.

However, AZ did decide in May 2012 that it wanted all the claims settled

because AZ felt (correctly as it turned out) that it had more exposure after the

Supreme Court oral argument on April 25, 2012, which did not go well for AZ.

(Doc. 259, Carlson Depo. I, 44:9-22.) Mr. Gary Carlson, AZ's Chief Operating

Officer, summarized AZ's position on May 25, 2012, in an email to AZ's defense

counsel and to Don Laine, AZ's President, by stating:

> From our point--the settlement negotiations with Deola must include
> the Garrison case, the Schindler case that is about to be served, as
> well as the "other" party she has contacted, as well her [Ms. Deola]
> ceasing to use the "list" she has of Acquiron transactions to obtain
> further cases against AZ or Acquiron.

(Doc. 265-3 at 3.)

Plaintiff's allegations now before the Court are that NYM failed to settle

with Redding when she made a $2 million policy limit demand in February, 2011,

that NYM required the six other claimants to settle their claims in a global

settlement before it would settle with Redding (thereby leveraging Redding's

desire to settle in order to obtain a settlement with the other six claimants), and

that NYM did not timely pay the insurance proceeds after a global settlement was

reached between the seven claimants and AZ.

When it came time to settle the case in May 2012, AZ and Redding were

concerned about what they would do if NYM refused to provide coverage for

Redding's claim and the other five claims. Drake and Deola discussed a proposal

whereby Redding would settle separately with AZ, which would then assign to Redding its first-party bad faith and breach of contract claims against NYM (for failure to settle), allowing Redding to sue NYM for both her third-party bad faith claim and AZ's first-party bad faith claim and the breach of contract claim. (Doc. 259-11, Deola Depo. II, 71:16-73:25.) This is generally called a *Damron* agreement. *See Damron v. Sledge*, 460 P.2d 997 (Ariz. 1969).

There is nothing inherently wrong with a *Damron* agreement, whereby, if, after the insurer fails to defend or otherwise breaches the insurance contract, the insured confesses judgment in a specific amount and assigns to plaintiff its first-party bad faith and contract claims against the insurance company, all in exchange for plaintiff's covenant not to execute upon the insured's assets. Of course, the *Damron* settlement agreement must be reasonable in amount and not otherwise fraudulent, collusive, or against public policy. *See, e.g., Tidyman's Management Services, Inc. v. Davis,* 376 Mont. 80, 330 P.3d 1139, 1154 (Mont. 2014) (recognizing "the opportunity for mischief in settlement negotiations where the insurer has declined involvement--which may be checked by judicial review of whether the settlement amount stipulated to is reasonable.").

However, a *Damron* agreement must be preceded by some breach of the insurance contract by the insurance company, such as would justify the insured's

breach of the standard cooperation clause in the insurance contract.  In *Damron*,

for example, the insurer's breach was its failure to defend the insured. *See*

*Damron*, 460 P.2d at 999 (quoting *Critz v. Farmers Ins. Group*, 41 Cal.Rptr. 401

(Cal. Ct. App. 1964) ("When the insurer breaches its obligation of good faith . . . .

there is an acute change in the relationship between policyholder and insurer.")).

If such an agreement is entered into between the insured and the claimant, but it is

later determined that the insurer did not, in fact, breach any of its obligations, then

the insurer will not have to pay the stipulated judgment.  *See Safeway Ins. Co., Inc.*

*v. Guerrero*, 106 P.3d 1020 (Ariz. 2005).  Generally, when an insured enters into a

stipulated settlement with a claimant without notice to an insurance company, that

breach of the cooperation clause relieves the insurance company from any liability

under the policy.  *See, e.g., Smith v. Progressive Cas. Ins. Co.*, 61 S.W.3d 280

(Mo.App. E.D.. 2001); *see also Safeco Ins. Co. v. Superior Court*, 84 Cal.Rptr.2d

43 (Cal. Ct. App. 1999) (holding, despite a reservation of rights, that "when the

insurer provides a defense to its insured, the insured has no right to interfere with

the insurer's control of the defense, and a stipulated judgment between the insured

and the injured claimant, without the consent of the insurer, is ineffective to

impose liability upon the insurer.").

    In addition, the NYM insurance policies, as with many professional

insurance contracts, explicitly prohibited the insured from settling without the consent of the insurance company. *See* Doc. 253-1 at 27-28, and Doc. 253-2 at 31-32 (¶ 9.4, ¶ 9.9).) Such a provision is waived by wrongful denial of coverage or refusal to defend. In this case, the insurer did defend, albeit under a reservation of rights, but ultimately agreed to provide full policy limits coverage. Therefore, given the contract provisions ¶¶ 9.4 and 9.9 ("An agreed settlement means a settlement and release of liability signed by us, you and the claimant or the claimant's legal representative."), it would appear that NYM was contractually entitled to be a party to any settlement agreement between AZ and its claimants. (Doc. 253-1 at 27-28.)

The key feature of a *Damron* proposal in the Underlying Action would have been that Redding would release any claim she might have to AZ's assets, thereby releasing AZ from its excess liability as to her claim. In fact, on May 20, 2012, Drake prepared and circulated a settlement document between AZ and Redding, without the knowledge of NYM, that called upon Redding to agree not to execute on AZ's assets in return for a confession of judgment by AZ and AZ's cash payment to Redding of $10,000. (Doc. 265-3 at 5.)

In December, 2011, just prior to filing the coverage lawsuit, Drake had requested Deola's permission to name Redding and several other of Deola's

clients as nominal defendants, on the theory that they were "stakeholders" in the policies, and Deola consented. Because Drake was in charge of AZ's coverage dispute with NYM, Drake was clearly adversarial to NYM throughout the underlying litigation. However, it appears that he may have at certain points led the negotiations for the settlement of the Underlying Action.

Drake also gave to Deola his own opinions (adopted by her) as to the availability of coverage through NYM and also through any other insurance carriers relevant to NYM's co-defendants Petersen and Ahmann. (*See* Doc. 259-10, Deola Depo. I, 40:14-21 ("*But I know that there was discussions about AZ's policies in 2012 with Mr. Drake, AZ's coverage counsel.*"); 41:18-23 ("*So I would have reviewed [the policy] and read it but the interpretation and application of the policy really would have come from discussions with AZ's coverage counsel, Mr. Drake.*"); 43:15-20 ("*No, I would have relied on the coverage counsel to [determine whether there was coverage].*"); 93:1-9 ("*so I was relying upon [Drake] to ultimately tell us which coverage was available.*").)

Sometime between May 21 and June 5, 2012, Drake told Deola that there would be $4 million in NYM insurance coverage available to settle all claims. (Doc. 259-10, Deola Depo. I, 93:10-25.)

During early 2012, AZ was facing (by the accounts of various lawyers)

approximately $10 to $30 million in damage claims alleged by seven of their former clients.  The problem was that AZ possessed only $4 million in insurance coverage, at most, to pay the claims (but perhaps only $2 million or perhaps even no coverage).  Drake apparently put out the suggestion of having AZ confess judgment and assign to Redding any right it had to a first-party bad faith claim against NYM (in exchange for Redding's agreement not to execute on AZ's assets) in case NYM did not provide coverage and also to manage the problem of AZ's excess liability.  The fact that AZ's coverage was itself precarious only exacerbated the total risk.  According to MDS counsel, AZ believed that if it were made responsible for all the damages alleged by the claimants (in the $10-$30 million range), AZ would be forced into bankruptcy.  The plan seems to have been either (1) to have AZ confess judgment for $4 million, with perhaps some extra cash paid by AZ, in exchange for an agreement by the claimants not to execute on AZ's assets, or (2) to have NYM actually pay the claimants $4 million through a negotiated settlement, and in exchange have the claimants release their all claims against AZ.  Either way, AZ and its assets would be protected and all seven claims against it would be resolved.  Either way, the plan was to require the seven claimants to give up their excess claims against AZ.

Throughout the settlement process, Drake and Deola communicated about

the insurance company's alleged bad faith, with the result that Deola apparently believed that AZ wanted to settle with her clients but was being blocked from doing so by bad faith misconduct of NYM. At some point in the settlement process, Drake knew that Deola was considering filing a third-party bad faith claim on behalf of Redding against NYM.

By late May and early June, 2012, Drake appears to have been involved in the tort cases as a negotiator for AZ, to the extent that defense counsel (Patrick HagEstad of the MDS law firm) was coordinating his negotiation activity with Drake. It was HagEstad's role to keep NYM informed as to settlement negotiations. After five or six weeks of settlement negotiations, however, HagEstad suffered a heart attack and his associate, Brad Condra, substituted in for him and saw the case to its conclusion; Condra therefore handled communications with NYM in late June and July, 2012. However, sometimes the MDS lawyers (HagEstad and Condra) were not kept in the loop of communications between Drake and Deola.

When AZ's officers and directors decided in mid-May, 2012, that they wished to settle all the claims, and quickly, Drake contacted Deola on May 18, 2012, to find out what she would demand for a global settlement. (Doc. 259-1, Carlson Depo. II, 13:14-24.) AZ definitely wanted to settle all claims together.

(Doc. 259-1, Carlson Depo. II, 20:2-3, 49:13-15 ("But our interest was in facilitating and completing the overall global settlement.").) HagEstad asked Deola to present a demand for her six clients, which she did. (Doc. 259-10, Deola Depo. I, 97:7-9.) On May 22, 2012, the NYM claims adjuster noted in his claims file that HagEstad reported "that Plaintiff's attorney may want to bundle all six claims and settle them presumably under this file and policy. I have asked DC [defense counsel] to confirm and report his findings to me." (Doc. 258 at 9.) On May 29, 2012, HagEstad asked Deola if the settlement would also include the one claimant (Garrison Ranches) not represented by Deola. (Doc. 259-12 at 2.) The next afternoon, May 30, 2012, Mike Layne emailed Deola, and told her that "if . . . we can pin down the insurance company to say full settlement with all parties or no settlement at all, I think we can take the settlement and preserve our bad faith claims against the insurance carrier." (Doc. 276-1 at 3.) Hours later, Deola emailed HagEstad and said,

> I want to be sure I understood this email from you that the insurance company will only put up what I understand to be two policy limits if all of the Plaintiffs agree to settle. Talk to you soon.

(Doc. 259-12 at 2.)

This email is relevant to NYM's defense of unclean hands, and it provides information that cannot be obtained by any other means. (Doc. 3, Answer at 11,

Second Affirmative Defense.)  *See Charlotte Motor Speedway, Inc. v. Intl. Ins. Co.*, 125 F.R.D. 127, 130 (M.D.N.C. 1989) (permitting discovery of privileged material because "the activities and advice of Plaintiff's counsel in the settlement of the underlying action are inextricably interwoven" with the issue of liability); *see also* 4J. Moore, Federal Practice 26.64[4] ("[W]hen the activities of counsel are inquired into because they are at issue in the action before the court, there is cause for production of documents that deal with such activities, though they are 'work product.'").  Nevertheless, the instant decision is not based on this one email.  That Redding's counsel were considering setting NYM up for a subsequent bad faith lawsuit is apparent from the record and, perhaps more important, was well known by some, if not all, of the individuals working on the litigation.  As early as May 31, 2012, HagEstad informed Gary Carlson of AZ in an email that "[Deola] is confident that she has set the carrier up for no limits."  (Doc. 259-1, Carlson Depo. II, 49:18-19.)

HagEstad testified at length on the subject of Deola's May 30 email when Deola questioned him during his deposition:

> Q. [Deola]  And then when the inquiry was made by May 30th as to whether or not the insurance company would only put up the policy limit demands if all plaintiffs agreed to settle, no dispute, you never refuted that in writing?
> A. [HagEstad]  It never came up.  That's not what was going

on.

Q. [Deola]  I'm just simply asking you when you look at Exhibit 7 [Deola's 5/30/12 email to HagEstad], it asks for a clarification, does it not the May 30, 2012, e-mail back to you?

A. [HagEstad]  Right.  And we had a phone call about it.

Q. [Deola]  And I'm asking you whether or not you responded to that inquiry in writing?

A. [HagEstad]  I don't know.

Q. [Deola]  Okay.

A. [HagEstad]  I'm pretty sure we had a phone call about it though.  Because at this point I remember being confused again saying where is this coming from, I'm just going to call them.

Q. [Deola]  Where is what coming from?

A. [HagEstad]  Your response.  Because nobody had ever told you that the insurance company will only put up what I understand to be two policy limits if all the plaintiffs agree to settle.

Q. [Deola]  Did you [think] that was an important fact to clarify?

A. [HagEstad]  Well, let me just tell you this, one, I was always clear with you that we did not know how many policy limits were available.  So I never would have represented at any time until Nick gave me okay that two policy limits were available, so that's the first thing.

Second thing is prior to this I don't remember anybody saying that the insurance company will only put up what I understand to be policy limits if all of the plaintiffs agree to settle.  I don't remember ever telling you that.

Q. [Deola] So my question to you is:  Do you think that would have been an important fact to clarify?

A. [HagEstad] And we did so by telephone call.

Q. [Deola]  And that's your testimony that there was a phone call that clarified that?

A. [HagEstad] Yes.

(Doc. 259-4, HagEstad Depo. 103:22-105:14.)  During this deposition by Linda

Deola, HagEstad also testified that "[i]t wasn't that this [global settlement] had to

21

be this way, it was this is what I thought we were working on." (Doc. 259-4,

HagEstad Depo. 100:17-19.)

HagEstad absolutely denied that he had conditioned a global settlement on

releases of all the Defendants: "No, I did not make that representation. This e-

mail [HagEstad's email on 5/29] is an inquiry as to what did you envision this to

be." (Doc. 259-4, HagEstad Depo. 106:7-14.) HagEstad explained,

> "No, what it was, was an inquiry as to what did you mean, were
> all these things included, is that what you were envisioning, because I
> was trying to see if we're on the same page. There's no condition in
> this and there never was as I recall, it's this way or the highway. I do
> not remember that at all."

(Doc. 259-4, HagEstad Depo. 107:14-20.)

Deola questioned HagEstad whether it was his idea to include the Garrison

Ranch in a global settlement:

> Q. [Deola] I know we've been over this, but this is important
> and that's why I'm asking you again. You would agree that the
> Garrisons were never included in the only written demand you
> received from the plaintiffs in this case, were they?
> A. [HagEstad] Right. And they were included based upon
> discussions that you and I and others on my behalf and Mr. Gallik.
> Q. [Deola] And that inclusion of the Garrisons was an issue
> raised by the defendants in this case, was it not, the Redding plaintiffs
> didn't ask for the Garrisons to be included in this settlement, did
> they?
> A. [HagEstad] We didn't ask for them to be either. We asked
> if they were.

(Doc. 259-4, HagEstad Depo. 107:21-108:3.)  When asked whether AZ requested

the inclusion of Garrison Ranch in the settlement, HagEstad responded, "No, I

think we probably asked if that was part of it.  And we were told that could be

worked out if Brian's[2] clients agreed to it, that your [Deola's] clients would."

(HagEstad Depo. 100:24-101:2.)  In fact, HagEstad testified, it was Deola herself

who first contacted Garrison Ranch:

> Q. [Deola]  Okay.  Did you contact the Garrison's attorneys in
> May of 2012 and ask them for a demand on behalf of the Garrisons?
> A. [HagEstad]  As I'm sitting here, I want to say that the first
> contact with the Garrisons about this was from you after a
> conversation that you and I had where you would see if they were
> even interested in it.  And then I think you called me back at some
> point and said they're interested, they want to talk to you, that you
> can't speak for them.
> ...
> Q. [Deola]  But my question was whether or not you ever
> contacted the Garrison's counsel in May of 2012 and requested a
> demand for settlement from them separately.
> Q. [HagEstad]  No.  My recollection was after you had
> indicated that they would consider the idea, either myself or someone
> on my behalf contacted them and they indicated they would consider
> being part of a global settlement.

(Doc. 259-4, HagEstad Depo. 111:23-112:24.)

During his deposition, HagEstad finally stated that "[my] recollection, Lin,

---

[2]  Apparently there was some confusion early on among the lawyers as to the
identity of Garrison Ranch's lawyer.  Eventually it was understood that Garrison
Ranch's lawyer was not Brian Gallik but John Bloomquist.

is and I apologize if I'm not remembering this correctly, but my recollection is you, you either offered to or said that you would [contact Garrison's attorney] and I said okay." (Doc. 259-4, HagEstad Depo. 114:7-10.)

Overall, HagEstad described his working relationship with Deola as "two ships in the night": "you and I missed each other. I would be thinking one thing, you would be thinking something else, so there was a lot of phone calls to try and say what do you mean." (Doc. 259-4, HagEstad Depo. 101:20-25.)

So, eventually, Deola telephoned counsel for Garrison Ranches, John Bloomquist, and learned that his client would be willing to consider a global settlement. HagEstad ascertained that NYM's claims adjuster was interested in hearing more about the possibility of a global settlement with a possibility that NYM might decide to fund the settlement with $4 million, and HagEstad communicated that fact to Drake. (Doc. 265-3 at 6.)

In early June, 2012, while HagEstad was in Texas on a family vacation, Drake was leading the negotiations for AZ, and all seven plaintiffs agreed with AZ to settle their claims for $4.65 million. The global settlement agreement called for NYM to contribute $2 million from each of two insurance policies and for AZ to contribute $250,000 in cash and $400,000 in four annual installments beginning one year later.

On June 5, 2012, upon learning from Deola that the claimants agreed to accept $4.65 million, HagEstad informed Deola and Drake that NYM had not yet agreed to pay any policy limits--much less two policy limits totaling $4 million--so AZ did not yet have $4 million in insurance proceeds to offer the claimants. (Doc. 259-4, HagEstad Depo. 141: 18-21.) HagEstad testified that Drake did not consult him about what NYM would or would not pay. (Doc. 259-4, HagEstad Depo., 140:6.) HagEstad was waiting for NYM to make a decision on coverage, before he would know how to respond to Deola's demand, and HagEstad did not know that Drake had made an offer on AZ's behalf. On June 5, 2012, HagEstad sent an email to Drake on his iPhone that said that NYM's claims adjuster was "waiting for a coverage opinion on whether just one policy." (Doc. 265-3 at 8.) NYM was not immediately informed by anyone of the global settlement between the insured and the claimants. Not realizing that Drake had been negotiating separately with Deola, HagEstad believed that Deola "had accepted her own offer," as HagEstad explained the situation to NYM's claim adjuster. (Doc. 259-4, HagEstad Depo., 138:18-22; 149:23-24.) Meanwhile, AZ was pleased at having settled all the claims against it (Doc. 265-3 at 2, 270-4 at 2), and Drake had begun drafting a settlement and release agreement to be signed by the plaintiffs (Doc. 125-18 at 1).

Two weeks later in June, 2012, NYM finally received notice of the

settlement between the claimants and AZ from the MDS law firm, which also informed NYM that AZ requested and HagEstad recommended that NYM agree to fund its $4 million share of the $4.65 million settlement. (Doc. 258-15 at 7.) NYM's position as to coverage was not yet settled. NYM demanded that defense counsel provide executive summaries of each claim to be settled, one of which had been filed less than two weeks earlier and was relatively unknown to NYM. (Doc. 258 at 7.) After considering defense counsels' summaries and recommendations, NYM agreed to fund $4 million for the global settlement. On June 30, 2012, Brad Condra emailed AZ President and CEO, Donald Laine, to inform him that NYM had agreed to contribute $4 million to the global settlement. (Doc. 259-21 at 3.) AZ understood that, while the $4 million would be paid, AZ's coverage dispute with NYM would remain. (Doc. 259-1, Carlson Depo. II at 191:7-21; Doc. 259-17, Laine Depo. 132:14-133:12.)

While the plaintiffs urged an immediate transfer of funds, they eventually agreed to a payment deadline of July 27, 2012; NYM transferred $4 million to Deola on July 27, 2012, by hand delivery by Brad Condra to Linda Deola. (Doc. 259-11, Deola Depo. II, 107:14-20.) Deola then distributed funds to Redding, to her other clients, and to herself and the other two plaintiffs' counsel.

Before that payment occurred, however, a serious glitch arose in July, 2012,

when NYM received a draft of the "Settlement Agreement and Release of all Claims." (Doc. 259-20.) This document was prepared by Drake, revised by Deola, and then signed by all of the claimants, perhaps even before NYM had a chance to suggest any revisions. The document did not provide a release of NYM by any of the claimants. Of even greater concern to NYM, the document specified that NYM was not released as to any violations of Montana insurance law. By this time, all the attorneys involved knew that Deola was threatening to sue NYM for bad faith after the tort claims settled, and that intention was clearly telegraphed in paragraph 9 of the Settlement Agreement. (Doc. 259-20 at 5). This information apparently caused NYM consternation in the two weeks before it cut two $2 million checks.

In response, however, NYM was undeterred from its previous agreement to fund the settlement. NYM did not require any release for itself. It informed AZ that it would make the $4 million payment as agreed, but under a reservation of rights to recoup the $4 million from AZ after the coverage adjudication. In the alternative, NYM proposed that AZ agree to indemnify it as to any future claims arising out of the Coverage Action or the Underlying Action.

Once again, in the days just prior to NYM's payment of all seven claims, Drake began discussing with Deola the possibility of another confession of

judgment by AZ and an assignment of AZ's first-party bad faith claim in exchange for a waiver of lien on AZ's assets. (Doc. 217-8 at 8.) At about the same time, on July 20, Drake's email to Deola proposed an anticipatory press release to be released if NYM did not transfer funds as agreed. The press release proposed by Drake states that AZ and the claimants were unhappy because NYM had refused payment after not obtaining settlement terms favorable to it and that the claimants would be forced to sue NYM for payment. (Doc. 217-6 at 13 (DL_141).) However, both of these alternate plans were apparently abandoned, because NYM did in fact transfer the $4 million payment to Deola on July 27, 2012, albeit under a full reservation of rights by NYM to recoup from AZ not just the $4 million, but "all amounts paid by New York Marine...." (Doc. 259-27 at 2-3.) The three plaintiffs' counsel (Deola, Layne, and Bloomquist) then divided the $4 million among themselves and their respective clients. NYM was never fully informed of the distributions until finally Deola disclosed that information after the close of discovery in this case. The coverage action was apparently settled between NYM and AZ in July or August, 2012, and a stipulation for dismissal of that case was filed five months later, in December, 2012.

In the Underlying Action, Redding claimed damages in excess of the 2008 insurance policy that was applicable to her claim. That policy carried an aggregate

limit of $2 million.  NYM paid the 2008 policy limit of $2 million over to Ms.

Redding's counsel.  During discovery, Redding failed to disclose any

settlement/allocation distribution documents or to itemize the documents on a

privilege log, even though such documents were requested by NYM in discovery.

(Doc. 259-11, Deola Depo. II, 3:14-6:12.)  Eventually, it was revealed that Deola

distributed approximately $450,000 to Redding from the $2 million payment and

the rest to her other five clients, plus Bloomquist and his client.  (In addition,

Deola's other five clients and Bloomquist's client also shared in the $2 million

proceeds from the 2010 policy.)  Of the $2 million policy proceeds available and

applicable to Redding's claim, Redding's share was $681,696.96 (less attorney

fees and costs), as was finally revealed when Deola testified at her second

deposition.  (Doc. 259-28 at 2.)

    Deola testified that her attorney fee percentage as to Redding was only 14%

of Redding's recovery, because she split her fee with co-counsel, Mike Layne,

who received 19% of Redding's recovery.  (Doc. 259-11, Deola Depo. II, 24:19-

23.)  As to her other five clients, however, Deola served as the sole plaintiff's

counsel, and she testified that her fee percentage as to three of her other clients

was 33% each, and as to two of her other clients her fee was 30%  each. (Doc,.

259-11, Deola Depo. II, 32:17-19, 33:3-19.)  Deola received $96,564.08 in

attorney fees from Redding and $1.1 million in attorney fees from her other five clients.  (Doc. 259-28/29/30/31/32/33, at 2.)

Part of NYM's defense to the failure to settle claim was that NYM did, in fact, pay the $2 million policy limit on the 2008 Policy.  NYM also demanded to know how much money Redding received through the settlement in order to calculate her damages.  Completely unaware of any of these settlement details, Redding testified during her deposition that she had not realized that she could have negotiated with the other claimants for a larger share of the $4.65 million settlement.  (Doc. 259-14, Redding Depo. 106:10-13.)

In the first two hearings in this case, Deola asserted that she would provide the Court with written evidence that AZ decided to settle with Redding in February, 2011.  No such evidence has been presented to the Court, and AZ representatives (Chief Operating Officer Gary Carlson and President Donald Laine) were definite that AZ did not request that NYM settle with Redding during February, 2011.  (Doc. 259, Carlson Depo. I, 32:3-13 *"We did not request that they settle it."*; Doc. 259-17, Donald Laine Depo., 66:7-10, 66:21-67:5 (There were no discussions regarding any Redding settlement prior to the filing of the other claims.).)  The March 2011 offer aside, AZ did not seek a settlement with Redding or any of the other six claimants until late spring in 2012, when a

settlement was indeed negotiated by HagEstad, Deola, and Drake. Unsurprisingly, AZ representatives have acknowledged unequivocally that when it came time to settle in the Spring of 2012, AZ wished to settle with all of the claimants, not just with one or two of them.

As this instant bad-faith case ground on, communications between opposing counsel became increasingly strained. There were multiple discovery problems. The case became particularly heated after NYM filed a motion to disqualify Deola as trial counsel on the ground that she would be a necessary fact witness as to the settlement negotiations and as to her allocation of the proceeds to Redding, to herself, and to her other clients.[3] In fact, upon receiving notice of the filing of NYM's motion to disqualify, Deola immediately sent an email to NYM counsel threatening to move to disqualify NYM counsel.

The Court ultimately conducted a hearing on NYM's motion to disqualify Deola and granted the motion, finding that Deola was indeed a necessary fact witness and requiring Deola to withdraw as trial counsel. *See* Rule 3.7, Mont. R. Prof. Conduct, prohibiting lawyers from acting as trial counsel and as witness in the same proceeding. One of Deola's partners, Mr. Brian Miller, then appeared as

---

[3] NYM paid the $4 million directly to Deola, who then determined with the other counsel how the funds should be distributed to the seven claimants and counsel. NYM had no knowledge of the settlement distributions.

trial counsel for Redding. The Court also refused to quash NYM's deposition of Deola, which did take place but was not entirely successful due to the fact that Deola's memory of the Underlying Action was not good and also due to the fact that she failed to bring to her deposition documents such as the spreadsheet that detailed her distribution of the settlement funds to her clients.[4] The deposition was not productive, as was predicted by Deola herself when she sent an email to opposing counsel stating that she was "likely to answer very few questions and [was] prepared to be held in contempt if necessary." (Doc. 217 at 4.) Further complicating the matter, just three days before the deposition, Deola disclosed additional documents that were redacted, but with no privilege log to explain the reasons for the redactions. (Doc. 214 at 11.)

Shortly after Deola's deposition, Redding's new trial counsel, Mr. Miller, filed a retaliatory motion for disqualification of NYM's counsel, Mark Goodman, a motion which, after careful consideration and oral argument, this Court viewed as "patently frivolous." (Doc. 237, Order dated June 10, 2014, at 3.) The Court stated that it would hear NYM's request for attorney fees and costs incurred in

---

[4] At the time of Deola's second deposition, the Court--to protect the interests of both sides--ordered after a hearing that the deposition be held in the courtroom so that the undersigned could be called in from chambers to rule on any objections. No objections were presented to me, however.

responding to Plaintiff's motion to disqualify opposing counsel, which the Court did do at a hearing on September 19, 2014. (Doc. 298, 9/19/14 TR 38:24-41:3; 45:7-47-9.)

In the months following Deola's deposition, late discovery from AZ showed that Deola had failed to disclose certain relevant non-privileged documents. Defendants found emails between Deola and AZ's defense lawyers and Drake, which emails had not been previously disclosed by Redding, and some of which referenced additional undisclosed documents. NYM moved for additional discovery, a second Deola deposition, and a contempt citation and monetary sanctions against Redding and her counsel. The Court granted NYM's motion for additional discovery, including a second deposition of Deola. The Court issued its 26-page written Order on July 2, 2014, explaining in detail its rulings on the discovery issues raised by the Defendants' Motion to Compel and Motion for Contempt, which Order also found that Plaintiff and Ms. Deola, and her firm should be assessed attorneys fees and costs attributable to the motion, to the hearing thereon, and to Ms. Deola's second deposition. (Doc. 262, Order dated July 2, 2014.) The Court declined to find Plaintiff in contempt, although the Court did find that Plaintiff did commit the discovery abuses that NYM alleged, and that she withheld discovery without substantial justification. The Court therefore did

state that it would award NYM its reasonable expenses and attorney fees "attributable to the bringing of Defendants' motion to compel additional discovery, appearing for the June 23 hearing, and conducting the second deposition...." (Doc. 262 at 24.) The Court gave the parties 10 days to arrive at a stipulated amount of Defendants' fees and costs and, in the event that the parties could not agree, the Court instructed Defendants to file a motion for attorneys fees and costs for the Court's ruling. Apparently, shortly thereafter, NYM presented a bill to Redding's counsel for $48,000 in attorneys' fees and costs. Redding responded by filing a motion for recusal of the undersigned district judge.

This Court expects from counsel civility and adherence to the rules of practice and professional conduct. Repeatedly, the undersigned district judge has attempted to extract some semblance of cooperation from counsel in this case. At the beginning of the June 10, 2014, hearing, the Court perceived that the relationships between counsel were becoming a problem. The Court stated:

> THE COURT: Counsel were getting along quite well at the beginning of the case. I think perhaps the relationship has eroded a little bit. I would like all of you to think about civility and your professional responsibilities and to be aware that your personal feelings that we all have as humans when we disagree with each other are subservient to counsel's duty to perform according to the rules.

(Doc. 244, 6/10/14 TR 4:14-20.) The Court also closed that hearing with the

following admonition to counsel:

> THE COURT: Thank you both for being here. And, again, I urge you to get along with each other. Sit down as though it were a brand new case and you were dealing with somebody you had never seen before and you wanted to make a good impression on them.
> ...
> THE COURT: See if it doesn't come easier and with better results for both sides.
> Court is adjourned.

(Doc. 244, 6/10/14 TR 37:6-14.)

At the end of the June 23, 2014, hearing, The Court also admonished counsel in this case, in a little more pointed language, to cooperate with each other:

> Now, I'm going to remain in chambers during the deposition [of Ms. Deola]. If there is an objection that requires the Court's ruling, I will come in and hear the [objection] and rule on it.
> I want you lawyers to get your heads together. You know that there are feet being dragged. There's spiteful conduct that has gone on. I want that to stop. And I want you all to do your duty here. Be professionally responsible.

(Doc. 261, 6/23/14 TR 35:10-17.)

The Court denied NYM's request for a contempt citation against Ms. Deola because I wanted to give every reasonable incentive to Plaintiff's counsel to focus on the legal issues in the case. The Court's ultimate goal was appropriate and timely adjudication without further controversy.

In spite of the Court's efforts to keep this litigation moving toward resolution, Plaintiff's counsel now claims to believe that those of the Court's decisions that have gone against the Plaintiff have been so unfair to her that--after two years of litigation and after the filing of NYM's motion for summary judgment--it has become necessary for Mr. Miller to file a motion for my recusal.

Plaintiff's motion for recusal accuses me of being biased against plaintiff's counsel and having an outdated understanding of the law. Plaintiff's theory is that my outdated understanding of the law constitutes an *extrajudicial* influence upon the Court such as would justify recusal. In classic straw-man argumentation, plaintiff's counsel misrepresents the Court's statements and then proves those misrepresented statements to be wrong.

For example, Mr. Miller claims that this Court thinks that Redding should have released her future bad faith claim against NYM in exchange for insurance proceeds in the underlying case. Nothing could be further from the truth. The Court merely queried whether it was bad faith for Redding to refuse to release the insurance company from her *underlying claim* in exchange for her receipt of insurance proceeds. (Doc. 244, TR 16:4-13; 16:22-24.) The purpose of the questioning related to a then-pending question whether another lawsuit, *Anderson ZurMuehlen & Co., P.C., v. New York Marine and General Ins. Co.*, CV 14-33-

BU-SEH, should be consolidated with this lawsuit. It was Mr. Miller's choice to misconstrue the Court's question and to leap to a judgment of the Court, which he has now fully developed in his recusal motion.

With all this background in mind, the Court will now consider Plaintiff's motion for recusal, Defendant's motion for summary judgment, and Defendant's motions for costs and attorney fees. The motions came on for hearing on September 19, 2014. Mr. Brian Miller of the Montana law firm Morrison, Sherwood, Wilson & Deola, PLLP, argued the motions for Plaintiff, and Mr. Mark Goodman of the Squire Sanders law firm argued the motions for Defendants. Having been fully informed by the parties and all the record, the Court is prepared to rule.

## I.    Plaintiff's Motion for Recusal.

Plaintiff filed an untimely Motion for Recusal of the undersigned district judge two years into the case, after discovery had closed, after a summary judgment motion had been filed, and at a time when the Court was preparing for the hearing on summary judgment.

Plaintiff asserts that this Court has advocated on behalf of Defendants, has consulted extrajudicial sources, has betrayed favoritism toward Defendants or

antagonism toward Plaintiff, has administered the case in order to favor

Defendants, and has generally exhibited partiality and bias against Plaintiff.

Plaintiff claims that the Court applied a double standard when it granted

Defendants' motion to compel discovery and motion to disqualify counsel but

denied Plaintiff's motion to compel discovery and motion to disqualify counsel.

A.  Standards.

Generally, "a judge should participate in cases assigned."  *Maier v. Orr*, 758

F.2d 1578, 1583 (Fed. Cir. 1985).  Judicial power vested by the United States

Constitution, *see* U.S. CONST. art. III, § 1, carries with it an obligation to exercise

that power to "faithfully and impartially discharge and perform [judicial] duties"

and to "administer justice without respect to persons, and do equal right to the

poor and to the rich."  28 U.S.C. § 453.

However, a judge may not sit in a case in which his "impartiality might

reasonably be questioned."  28 U.S.C. § 455(a); *see also* § 455(b) (itemizing

specific circumstances requiring recusal).  Thus, recusal can indeed be required by

the law and the facts of a case.  *See Clemens v. U.S. Dist. Ct.*, 428 F.3d 1175, 1179

(9th Cir. 2005).  At the same time, judges "must not simply recuse out of an

abundance of caution when the recusal is not appropriate."  *Sierra Pacific*

*Industries,* 759 F.Supp.2d 1198, 1201 (citing *United States v. Holland*, 519 F.3d

909, 912 (9th Cir. 2008)).  When the issue is a close one, however, the balance tips

in favor of recusal.  *United States v. Dandy*, 998 F.2d 1344, 1349 (6th Cir. 1993).

Section 455 of Title 28 of the United States Code provides that

(a)  Any justice, judge, or magistrate judge of the United States shall
disqualify himself in any proceeding in which his impartiality might
reasonably be questioned.

28 U.S.C. §§ 455(a).

The standard governing this statute is an objective one, because recusal is

required when "a reasonable person with knowledge of all the facts would

conclude that the judge's impartiality might reasonably be questioned." *United*

*States v. Hernandez*, 109 F.3d 1450, 1453 (9th Cir. 1997) (quoting *United States*

*v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986)).  A reasonable person is defined as

one who is not "hypersensitive or unduly suspicious" but instead is "well-

informed, thoughtful observer" who "understand[s] all the relevant facts" and "has

examined the record and the law." *Holland*, 519 F.3d at 914 (citations omitted).

Typically, an allegation of bias must arise from an "extrajudicial source."

*Liteky v. United States*, 510 U.S. 540, 554-56 (1994).  "[O]pinions formed by the

judge on the basis of facts introduced or events occurring in the course of the

current proceedings, or of prior proceedings, do not constitute a basis for a bias or

partiality motion unless they display a deep-seated favoritism or antagonism that

would make fair judgment impossible." *Id.* at 555. Only rarely can a judicial

decision be used to justify a motion for recusal. *Id.* "Unfavorable rulings alone

are legally insufficient to require recusal, even when the number of such

unfavorable rulings is extraordinarily high on a statistical basis." *Beverly Hills*

*Bancorp v. Hine*, 752 F.2d 1334, 1341 (9th Cir. 1984) (citing *Botts v. United*

*States*, 413 F.2d 41, 44 (9th Cir. 1969)); *see also Leslie v. Grupo ICA*, 195 F.3d

1152, 1160 (9th Cir. 1999) ("[The plaintiff's] allegations stem entirely from the

district court judge's adverse rulings. That is not an adequate basis for recusal.").

The question is sometimes raised whether the personal nature of a motion

for disqualification should become grounds itself for recusal, but this is not the

case because it could result in judge-shopping tactics. "[A] judge . . . should not

recuse himself on unsupported, irrational, or highly tenuous speculation. If this

occurred the price of maintaining the purity of the appearance of justice would be

the power of litigants or third parties to exercise a veto over the assignment of

judges." *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir. 1986).

Thus, even when a judge is the subject of a litigant's broadside attack, as when the

judge is actually named in a lawsuit, "where the allegations are so palpably

lacking in merit and integrity, the judge may, and should remain in the case to deal

with the spiteful plaintiff." *Mellow v. Sacramento Cnty.*, 2008 WL 2169447, at *3

(E.D. Cal. May 23, 2008); *United States v. Studley*, 783 F.2d 934, 940 (9th Cir. 1986) ("A judge is not disqualified by a litigant's suit or threatened suit against him, or by a litigant's intemperate and scurrilous attacks." (citations and quotations omitted)).

B.     The Court's Alleged Advocacy on Behalf of NYM.

Plaintiff argues that the undersigned judge advocated on behalf of Defendants when the Court questioned Defendants' counsel at the June 10, 2014, hearing regarding whether Deola acted in bad faith by aligning with Drake against NYM in the Underlying Action.  Plaintiff also complains that the Court characterized Redding's refusal to grant a release to insurer Defendants as being the primary cause of an agreement between NYM and AZ that settled the coverage dispute.  Plaintiff asserts that the Court was thereby advocating on Defendants' behalf by raising defenses and making allegations never asserted by Defendants.

In its opposition brief, Defendants state that their Second Affirmative Defense in their Answer (Doc. 3 at 11) is in fact the defense of "Unclean Hands," so that the Court's inquiries regarding bad faith on the part of Plaintiff were not advocacy from the bench but simply an instance of normal judicial inquiry into the facts of the case and the contentions of the parties.  It was certainly not this Court that introduced the idea to NYM that perhaps Plaintiff and her counsel had

colluded with AZ and its counsel against NYM during the underlying case. After all, just five days before the hearing, NYM filed a brief asserting that the documents improperly withheld from discovery by Plaintiff "evidenc[ed] collusion between AZ and the plaintiff in attempting to attribute to NYM bad faith conduct that simply never took place. . . ." (Doc. 216 at 24.)

During the June 10 hearing, the Court did ask Plaintiff's counsel why Redding would not release the insurer *for payment of her underlying claim*. It is unfortunate that Plaintiff's counsel felt that the Court's questioning was antagonistic to her, because the Court was really just doing its job to prepare to rule on her motion.[5]

The Court does not view its questions to Plaintiff's counsel and Defendants' counsel during the June 10 hearing to be advocacy on behalf of the Defendants. Rather, the Court was questioning counsel for the purpose of trying to better understand their respective claims and defenses to determine the relevance and

---

[5] In addition, and as the Court later explained to counsel during the hearing on the recusal motion (Doc. 298, September 19, 2014 Hearing, TR 6:14-7:3), the Court was also aware on June 10 that new litigation had been filed by AZ against NYM, litigation that focused on the coverage dispute and the NYM/AZ settlement. *AZ v. NYM*, CV 14-33-BU-SEH. Importantly, there was a motion to consolidate that case with this one then pending on June 10. (*See* CV 14-33-BU-SEH, Doc. 11.) In other words, during the June 10 hearing the Court was seeking to learn from counsel about the factual connections between two cases that might potentially be consolidated.

necessity of any testimony by Mr. Goodman in the instant case. Nothing said by the undersigned during that hearing amounted to advocacy on behalf of a party, and certainly not within the meaning of 'judicial advocacy' as it is described in the cases cited by Plaintiff. *See Reyes-Melendez v. INS*, 342 F.3d 1001, 1007-08 (9th Cir. 2003); *United States v. Singer*, 710 F.2d 431, 436-37 (8th Cir. 1983). My impression was that the hearing was conducted in a proper fashion for a proper purpose and that both counsel understood that the Court was appropriately informing itself as to the facts and the law of the motion under its consideration. In fact, the Court asked counsel to meet after the hearing and try to get along with each other, and when the Court concluded the hearing it fully expected that they would do just that.

C.    Extrajudicial Source.

Plaintiff asserts that during the hearing on June 10 the Court inappropriately consulted an extrajudicial source: itself. Plaintiff argues that it was inappropriate for the undersigned to consult recollections of 26 years of private law practice, as the undersigned had mentioned at the June 10 hearing. Further, Plaintiff argues that it was inappropriate for me to rely upon what counsel calls "deeply-held beliefs" about the law developed during those years of private practice. Therefore, according to Plaintiff's theory, a trial judge's recollections of private law practice

and a judge's knowledge of or beliefs about the law derived during decades of law practice are an *extrajudicial* source of information that must be studiously ignored by the trial judge when judging cases. Plaintiff cites no authority for this novel theory. This is a frivolous argument. Plainly, the Court has not relied upon any extrajudicial source which would justify recusal.

D.      Displays of Deep-Seated Favoritism or Antagonism.

Absent an extrajudicial source of bias as is the case here, the Court's statements on the bench and writings filed in the case would have to display a deep-seated favoritism or antagonism in order to permit a reasonable observer to conclude that the Court had abandoned its impartiality and embraced a bias against a party. *See Liteky*, 510 U.S. at 555.

Plaintiff quotes extensively from *Hubbard v. Sheffield*, 2014 WL 1309175 (D. Mont. March 31, 2014), as to the legal standards applicable to section 455(a). Those standards are set forth in excellent form therein. As Magistrate Judge Lynch correctly noted in *Hubbard*, when a judge's opinions are formed by means of the current proceedings (*i.e.* not from an extrajudicial source), then such opinions "do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Hubbard v. Sheffield*, 2014 WL 1309175, *4 (quoting *Liteky*, 510

U.S. at 555).

In this case, Plaintiff alleges the following conduct betrays a deep-seated

favoritism toward Defendants or antagonism toward Plaintiff:

1. The undersigned district judge questioned both counsel in open court
   regarding whether Plaintiff had acted in bad faith in refusing to
   release the insurer for her underlying tort claim.

2. The undersigned district judge questioned counsel in open court
   whether Plaintiff's refusal to release the insurer caused the insurer to
   seek indemnification from its insured.

3. The undersigned district judge allegedly "altered deposition
   testimony" by stating at a motion hearing in open court with all
   counsel present that Ms. Deola had testified that she did not have
   written agreements "between and among the other individuals...."
   Plaintiff asserts that Ms. Deola had testified that she did have written
   agreements with her clients.

Topic number three, unlike items one and two, is worthy of some additional

consideration. During the June 23 hearing and regarding the immediately-

following second deposition of Ms. Deola, I did discuss generally with the parties

what responsibility Ms. Deola had to answer deposition questions regarding her

multiple representations of claimants against AZ, in light of Ms. Deola's prior

deposition. (*See* Doc. 261, TR 36:2-12.) In her prior deposition, Ms. Deola had

stated that Ms. Redding received "a disclosure to her that [Ms. Deola] would come

on as local counsel, but beyond that I can't remember. I don't think she signed--

she did not sign an agreement with my firm. . . ." (Doc. 217-1, Deola Depo. TR 10:10-13.) Asked whether she had an agreement with co-counsel, Mr. Layne, to represent Redding, Ms. Deola responded, "I'm not sure. I think so. That would have been my practice is to have an agreement between the two of us, but I didn't look at that part of the file so I don't know." (Doc. 217-1, Deola Depo. TR 10:22-25.) When asked whether she had an agreement with Ms. Redding to represent other claimants against AZ, Ms. Deola replied:

> A    I'm not -- I'm sorry, I'm not sure what that means.
> Q    Sure, I'll restate. Did you have any agreement with Ms.
> Redding that would allow you to represent other parties against AZ
> other than Ms. Redding?
> A    No.
> Q    Do you know whether Mr. Layne had any such agreement?
> A    I don't know.
> Q    You represented other claimants against AZ, correct?
> A    Well, subsequent to -- that wasn't until long after she had filed her
> action, yes.

(Doc 217-1, Deola Depo. TR 12:14-13:5.)

> Q    Do you recall whether you had an agreement with Chevallier Ranch
>      that you could represent other claimants against AZ?
> A    No, I did not have such an agreement, a specific agreement.
> Q    Did Chevallier Ranch know that you were representing other
> claimants against AZ at the time that they retained you to your
> knowledge?
> A    Well, they were aware, would have been aware of the Redding
> matter but I don't, as I said, I don't recall if they were the first clients
> or not. But I can say generally all the clients I represented were
> aware that I represented other people against AZ, if that answers your

question.

Q    Okay.  Did Ms. Redding know that you represented other people against AZ?

A    I advised her counsel, Mike Layne, of the fact that I was considering taking on other clients before I took on those clients to be certain that he didn't view that as a conflict.

Q    And what did Mr. Layne tell you?

A    He did not see that, my understanding is it was not a conflict, he did not see it as a conflict.

Q    Do you know whether Mr. Layne ever had communications with Ms. Redding about your representing other parties against AZ?

A    I don't know.

Q    And you never had any communications directly with Ms. Redding about that?

A    Not that I recall.  You mean prior to the time I took on other clients?

Q    Correct.

A    Not that I recall.

Q    Did you ever have any communications with Ms. Redding at all about the fact that you were representing other clients against AZ?

A    I don't remember specific communications but as I, you know, met her-- let me think about that.  You know, I don't know.  I'm not certain because of the timing.

(Doc 217-1, Deola Depo TR 18:19-20:9.)

During the hearing I did have in the back of my mind some concern from reading this transcript, because when Deola was questioned about any representation documentation, she had not indicated that she had any writings signed by all six of her clients ("between and among") as to her multiple representations of their individual claims against AZ.  *See* Montana Rule of Professional Conduct, Rule 1.7(b)(4) ("each affected client gives informed

consent, confirmed in writing").  This apparent lack of documentation also caused me to consider further the application in this case of Montana Rule of Professional Conduct, Rule 1.8(g) ("A lawyer who represents two or more clients shall not participate in making an aggregate settlement of the claims . . . unless each client gives informed consent, in a writing signed by the client.").  However, I did understand that Ms. Deola had written representation agreements with at least some, but perhaps not all, of her clients.

The point here is that I did not "alter deposition testimony" when I stated that Ms. Deola did not have written agreements between and among the other individuals she represented, and maybe even with some of the individuals.  Even were I to have made a mistake in describing Ms. Deola's testimony, the fact that I raised the topic on the bench should have been viewed by Plaintiff's counsel as a good opportunity to correct any potential inaccuracy in the Court's understanding. My statements do not reveal any deep-seated antagonism toward Plaintiff because there is none.

E.  Conclusion as to Motion for Recusal.

Without the interference caused by a true extrajudicial source, Plaintiff cannot rely upon Court orders to justify a motion for recusal.  There is no extrajudicial source in this case.  Absent that element, Plaintiff must point to

evidence of the judge's deep-seated antagonism or favoritism, without resort to Court rulings. In fact, it appears that Plaintiff's brief in support of the motion for recusal focuses primarily on the Court's discovery rulings. This is not sufficient, as a matter of law. Plaintiff can point to no statements or conduct by the Court that are intemperate or otherwise betray deep-seated antagonism or favoritism.

The motion for recusal is denied.

## II. Defendants' Motion for Summary Judgment.

### A. Standards.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1)(A), (B).

The summary judgment movant bears the initial burden as to the elements of the causes of action about which there are no genuine issues of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265

(1986). The burden then shifts to the non-movant to establish the existence of a

material fact. *Id.* The non-movant "must do more than simply show that there is

some metaphysical doubt as to the material facts" by "com[ing] forward with

'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89

L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e) (1963) (amended 2010)). A

disputed fact raises a *genuine* issue for trial if it would permit a reasonable jury to

return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must construe

disputed facts in the light most favorable to the non-moving party. *Ellison v.*

*Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004). However, bare assertions

standing alone are insufficient to create material facts. *Liberty Lobby*, 477 U.S. at

247-48.

      B.     Montana Law Underlying Plaintiff's Claims.

      Moving now to the merits of the summary judgment motion, under Montana

law, an insurer cannot "refuse to pay claims without conducting a reasonable

investigation based upon all available information." § 33-18-201(4), MCA. An

insurer also cannot "neglect to attempt in good faith to effectuate prompt, fair, and

equitable settlement of claims in which liability has become reasonably clear."

§ 33-18-201(6), MCA. An insurer must not "fail to promptly settle claims, if

liability has become reasonably clear, under one portion of the insurance policy

coverage in order to influence settlements under other portions of the insurance

policy coverage." § 33-18-201(13), MCA. In Montana, an objective standard

governs such that "liability is 'reasonably clear' when a reasonable person, with

knowledge of the relevant facts and law, would conclude, for good reason, that the

defendant is liable to the plaintiff." *Peterson v. St. Paul Fire and Marine Ins. Co.*,

239 P.3d 904, 913, ¶39 (Mont. 2010). This standard is more demanding than the

preponderance standard, and is more "akin to the 'clear and convincing evidence'

standard, meaning that 'the thing to be proved is highly probable or reasonably

certain.'" *Id.* at ¶ 37 (quoting *Jackson v. State Farm Mut. Auto. Ins. Co.*, 600

S.E.2d 346 (W.Va. 2004)). Reasonable people must be able to agree about it, and

"if there is room for objectively reasonable debate about whether liability exists,

then it is not 'reasonably clear.'" *Id.* at ¶ 38 (quoting *Jackson*, 600 S.E.2d at 352).

In its defense, an insurer may assert § 33-18-242(5), MCA, which provides

that "[a]n insurer may not be held liable under [§33-18-201(1), (4), (5), (6), (9), or

(13)] if the insurer had a reasonable basis in law or in fact for contesting the claim

or the amount of the claim, whichever is in issue."

Under Montana law, the "reasonable basis" defense is not a question for a jury, but a matter of law for the court's determination. *See State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 418 ¶55 (Mont. 2013) ("None of our cases declare this issue of law to be a jury question, and *Redies* clearly resolved any doubt on the issue."). *Redies v. Attys. Liab. Protec. Socy.*, 150 P.3d 930 (Mont. 2007), clarified that

> reasonableness is a question of law for the court to determine when it depends entirely on interpreting relevant legal precedents and evaluating the insurer's proffered defense under those precedents. This distinction not only reflects the principle that the jury does not decide or determine the law, *see* 25-7-102, MCA, but also honors the relevant language of the statute at issue, *see* 33-18-242(5), MCA ("An insurer may not be held liable under this section if the insurer had a reasonable basis *in law* . . . for contesting the claim or the amount of the claim."

*Redies*, 150 P.3d at 938, ¶35 (emphasis in original).

C.    Whether NYM's Summary Judgment Motion Relies on Inadmissible Evidence.

1.    Failure to Plead an Affirmative Defense.

Redding argues that NYM has waived its main defense in the case because NYM failed to plead as an affirmative defense that NYM had a "reasonable basis in fact or in law" for contesting Redding's underlying claim. (Doc. 264 at 1, 10.) Redding cites *Penn v. National Interstate Ins. Co.*, 2013 WL 1089864, (D. Mont.

Jan. 4, 2013), for the proposition that a "reasonable basis" defense in an insurance bad faith case must be stated in the insurer's answer as an affirmative defense. However, a review of *Penn*, Montana case law, and Rule 8(c), Fed.R.Civ.Proc., reveals that there is no requirement under Montana law that an insurer present in its pleading an affirmative defense of "reasonable basis in fact or in law." Plaintiff's argument is without merit.

2.      Admissibility of Mediator's Statements Under F.R.E. 408.

While it is true that Rule 408, Fed. R. Evid., prohibits certain evidence (of the offering or the accepting of consideration in compromise of a claim) that is offered to prove or disprove the validity of a claim or the amount of a disputed claim, Rule 408(b) allows a court to admit this evidence for another purpose, giving several examples. In this case, it is Plaintiff who has dwelt on the facts relating to the failed mediation that took place in the underlying case on March 23, 2011, under the facilitation of mediator Stuart Kellner. Plaintiff asserts that NYM negotiated in bad faith by opening the negotiation with an offer of $250,000. NYM responds to Plaintiff's criticism by stating that mediator Kellner reported to them that Plaintiffs' counsel responded with a counter-offer of $6.5 million (more than three times the policy limit). NYM further states that mediator Kellner (not NYM) then terminated the mediation because the parties were too far apart and

progress appeared unlikely.

Plaintiff's argument over whether the mediator's statements are admissible under Rule 408 is without merit. First of all, Plaintiff has introduced the topic of the mediation in her Amended Complaint (Doc. 7, ¶¶ 18-19.) and has continued to assert that NYM's conduct relating to the March 23rd mediation is further evidence of bad faith. The Amended Complaint states that

> "18. On May 23, 2011, Billie Redding and the Defendants participated in a full day's mediation in Helena, Montana. The mediator agreed upon by all parties was Stuart L. Kellner, a Helena, Montana attorney who is a partner in Hughes, Kellner, Sullivan & Alke, PLLP. Defendants declined to send a representative to participate. The mediation failed.
> 19. At the mediation Defendants refused to make a meaningful offer of settlement."

(Amended Compl., Doc. 7, ¶¶ 18-19.)

Therefore, it is Plaintiff who is attempting to introduce evidence of an offer in compromise of a claim in order to prove her bad faith claim. If that evidence is not in violation of Rule 408, and it seems to fall under the "for another purpose" exception to the rule, then it would only seem fair that NYM should be able to respond to that evidence with its own mediation evidence that explains why its conduct at the mediation did not evidence bad faith.

Moreover, this argument by Plaintiff that the mediator's statements are inadmissible in support of NYM's motion for summary judgment is just a minor

afterthought to her claim that NYM failed to settle within the 30-day time period that she set for acceptance of her $2 million policy limit demand. Either the bad faith had occurred before the March 23rd mediation, or it had not, and any evidence regarding the conduct of any of the participants in the March 23rd mediation is not particularly salient as to whether that breach had occurred before the mediation ever took place. If there was no breach before the mediation because NYM had a reasonable basis in fact or law to decline to settle the case, then that reasonable basis defense carried through the March 23rd day of mediation and beyond, all the way to July, 2012, when the Montana Supreme Court ruled on AZ's summary judgment issue. Thus, if there was no breach of the good faith duty to settle before the mediation, there was no breach of good faith duty to settle during the mediation.

Furthermore, all the evidence submitted to the Court regarding the March 23, 2011, mediation indicates that NYM conducted itself in good faith. As HagEstad testified, he was not aware of any cap that NYM had placed on its settlement of the claim, other than the $2 million policy limit. (Doc. 259-4, HagEstad Depo., 38:6-14.) HagEstad testified, "I think we came to the settlement conference hoping we could get it done and in a good faith effort and we didn't feel like we got cooperation." (Doc. 259-4, HagEstad Depo., 58:10-13.)

Plaintiff's argument that NYM is foreclosed from submitting evidence of the mediator's statements pursuant to Rule 408, Fed.R.Evid., is simply without merit.

Plaintiff's fall-back argument is that if Rule 408 evidence of the mediator's statements can be submitted by NYM, then the record should be re-opened to allow Plaintiff to re-depose Robert Zepp as to the questions he did not answer pursuant to Rule 408. This is a red herring argument. First, Rule 408 never came up in Zepp's deposition. Second, what did come through clearly was that Robert Zepp knew little, if anything about the mediation because he didn't know the underlying case being mediated and he did not know any of the parties at the mediation. Robert Zepp testified in his deposition that he was hired days before the mediation by NYM *only* to attend the mediation and to sit in the chair of NYM claims adjuster Nick Nikow, who would participate by telephone. Zepp knew he was authorized to make an offer of $250,000. Although Zepp is an independent claims adjuster himself, he knew *nothing* about the Redding case other than what he read in AZ's settlement brochure for the mediator. Obviously, Zepp played little, if any role, during the mediation and merely observed events from within the group as a whole and the defense caucus. A second deposition of Robert Zepp would shed no further light upon this case.

3.    Admissibility of State Court Decision.

Redding cites *Johnstone v. Sanborn*, 138 Mont. 467, 481, 358 P.2d 399, 406 (Mont. 1960), for the proposition that once a decision is reversed "it is as if never rendered or made." Therefore, according to this argument, Redding asserts that NYM should not be allowed to rely on the state district judge's decision that granted NYM partial summary judgment on August 9, 2011, because that decision is "inadmissible" or, somewhat improbably, "non-existent." (Doc. 264, Pl.'s Response Brief at 17.) Under the doctrine of *res judicata*, a reversal of a district court decision is final for the purpose of that action (which, of course, is the principal purpose of Redding's quoted material taken from *Johnstone* (quoting *Central Montana Stockyards v. Fraser*, 320 P.2d 981, 991 (Mont. 1957)). That does not literally mean that the decision is non-existent and cannot be used for any other purpose.

Indeed, while the state district court decision was ultimately reversed in the underlying *Redding* case, it does provide one vantage point of the legal landscape at the relevant time period (February, 2011) that could support NYM's decision not to accede to Redding's policy limit demand in February 2011. Of course, Judge McCarter's decision is not conclusive as to NYM's "reasonable basis" defense, and in fact it did not yet exist at the time that NYM declined to settle with

Plaintiff. However, this state court decision points out that, in 2011, whether the DBSI TICs were securities was as yet an open legal question under Montana law. On that basis alone (*i.e.*, an open question of Montana law), and considering the reasonableness of NYM's conduct in February 2011, NYM and AZ were entitled to litigate the issue rather than accede to Redding's policy limit demand. To view it otherwise would infringe too much on AZ's right of access to the courts. Thus, the state district court's decision is admissible among many factors to be considered in this Court's determination whether NYM had a reasonable basis in law or in fact when it declined to settle with Redding in February 2011.

D.    Whether There Are Genuine Issues of Material Fact.

NYM seeks summary judgment on the grounds that it conducted a reasonable investigation of Redding's claim and found that liability was not reasonably clear at the time that Redding demanded the $2 million policy limit applicable to her claim in February, 2011. NYM also argues that it did not fail to promptly settle a claim under one portion of the insurance policy coverage (*i.e.*, Redding's claim) in order to influence settlements under other portions of insurance policy coverage (*i.e.*, the other six claims). Finally, NYM argues that after it found out about the global settlement agreement reached by AZ with the claimants, it promptly paid $4 million policy limits to the claimants within six

weeks or less.  In opposition, Plaintiffs argue that genuine issues of material fact preclude summary judgment.

1.     Whether Liability Was Reasonably Clear.

Plaintiff claims that there is a genuine issue of fact whether liability was reasonably clear when she made a policy limit demand in February, 2011.  Under the Montana Unfair Trade Practices Act, an "insurer may not be held liable under this section if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue."  Mont. Code Ann. § 33-18-242(5).   In this case, all three bases for the section 242(5) defense were in issue:  a question of law (whether the TICs were unregistered securities), a mixed question of law and fact (when did the statute of limitations begin to run and had it expired as to Redding's securities claim), and another mixed question of law and fact as to damages.  In February, 2011, there were numerous factual questions as to the calculation of Redding's damages.  First, about half of her damages consisted of an assumed mortgage debt, and defense counsel correctly suspected but had not yet verified that this was non-recourse debt that might not properly be included in Redding's damages claim.  This was an unresolved legal question that would affect the final calculation of Redding's damages.  Second, defense counsel had not yet obtained a final calculation of Redding's income on the investment,

which would have to be subtracted from her damages claim. Thus, defense counsel did not believe that they were able yet to calculate Redding's damages accurately.

NYM actually prevailed on the question of law at the district court level, and then the case settled before the Montana Supreme Court ruled in July, 2012. The case also settled before the statute of limitations defense or the damages defense were decided by the state court. Thus, NYM had a reasonable basis both in law and in fact to decide not to settle with Redding for policy limits in February, 2011. A fourth basis for the reasonable basis in law defense existed-- throughout the pendency of the Underlying Litigation--because there was a valid question as to whether there was any coverage for the securities claim and whether some of the claims related back to the 2008 policy. *See State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 418 ¶47 ("We have never held an insurer liable in bad faith for failing to settle within policy limits when it had a reasonable basis in law or fact for contesting coverage.").

The crux of NYM's motion requires the Court to determine whether AZ's liability was reasonably clear in February, 2011, when Redding presented her $2 million policy limit demand to AZ's defense counsel. Also, the Court must determine whether NYM delayed its settlement with Redding in order to influence

other claimants to settle their claims. In each instance the answer is clearly no.

The issue is not whether Redding's legal arguments in her underlying suit were correct, but whether NYM's stated grounds for declining to settle Redding's claim were reasonable under Montana law as it existed in February, 2011. The standard is not whether NYM proved to be correct as to Montana law, but whether NYM had a reasonable basis under the law or the facts of the case to litigate rather than settle. Again, this question of law is for the court, not a jury, to decide. In *Redies*, the Montana Supreme Court clarified that "while the assessment of reasonableness generally is within the province of the jury (or the court acting as fact-finder), *Dean*, 263 Mont. at 389, 869 P.2d at 258, reasonableness is a question of law for the court to determine when it depends entirely on interpreting relevant legal precedents and evaluating the insurer's proffered defense under those precedents." *Redies* ¶ 35 (citing *Dean v. Austin Mut. Ins. Co.*, 263 Mont. 386, 389, 869 P.2d 256, 258 (Mont. 1994)); *see also White v. State ex rel. Montana State Fund*, 371 Mont. 1, 7-8, 305 P.3d 795, 802 ¶ 24 (Mont. 2013).

First, in 2011 NYM believed that it could prove as a matter of law that the DBSI TICs were not securities as alleged by Redding in her complaint. DBSI had been selling TICs as 1031 exchanges for approximately 30 years "without incident." (Doc. 258-5.) The insured advised Redding to obtain her own counsel

to review the transaction for her, which she did.  The insured and its defense

counsel relied on a 2004 opinion letter from an Idaho law firm that opined that the

TIC investments were not securities.  (Doc. 258-5 at 5.)  The insured and its

defense counsel believed they also had a statute of limitations defense to the

securities claims.  (Doc. 258-5 at 5.)  Redding obtained a "specified percentage

interest" in four leases, over which she had some management control, including

the right to terminate the leases.  (Doc. 258-5 at 7.)  The defense expert opined

that at the time of the sale there was no Montana law on point and that it was an

open question whether the TICs were securities.  (Doc. 258-5 at 6.)  Defense

counsel repeatedly informed NYM that "it was important to get rid of the

securities claims if at all possible...." and if they won on the securities issue, then

"the potential range for damages should remain within policy limits."  (Doc. 258-5

at 11-12.)

In the underlying case, AZ argued that the *Duncan* test for a security could

not be met because there was no common enterprise in that Redding was promised

a return on her real estate investment that did not rise and fall with DBSI's fortune.

*See State v. Duncan*, 181 Mont. 382, 392, 593 P.2d 1026, 1032 (Mont. 1979)

("The touchstone (of an investment contract) is the presence of an investment in a

common venture premised on a reasonable expectation of profits to be derived

from the entrepreneurial or managerial efforts of others.") (quoting *United Housing Foundation v. Forman*, 421 U.S. 837, 852 (1975)). The state district court considered three different tests for 'common enterprise' (the horizontal commonality approach, the broad vertical commonality approach, and the narrow vertical commonality approach) and found that Redding could not show a common enterprise under any of these tests because she had not agreed to take on any risk in the venture. *See Redding v. Janiak, et al.,* ADV-2009-649 (Mont. 1st Judicial Dist. Ct. Aug. 9, 2011); Doc. 260-20 at 8-9. AZ also argued that having a master tenant/property manager such as DBSI did not render the commercial lease a security. The district court looked to the written contract to find that Redding had retained some significant management control under the lease. The district court also found that the transaction was not considered a security in 2004, noting that the Internal Revenue Service did not consider the TICs to be securities for federal taxation purposes in 2004. (Doc. 260-20 at 10.)

AZ won on this securities issue when the state district court granted it partial summary judgment on August 9, 2011, but lost by unanimous decision of the Montana Supreme Court on July 5, 2012, after the parties had already settled the case. The Montana Supreme Court noted that there was a split in the federal circuits as to how to define the common venture (or common enterprise) element

of a security. *Redding v. Montana First Judicial Dist. Court*, 365 Mont. 316, ¶27, 281 P.3d 189, 196 (Mont. 2012). In surveying the legal landscape in Montana as of July, 2012, the Montana Supreme Court stated that "Montana has not expressly adopted any of these tests for common venture." *Id.* at ¶31. The Court noted that "[t]his case requires us to adopt a method for determining what fulfills the common venture requirement." *Id.* at ¶32. The Montana Supreme Court disagreed with the district court's treatment of the common venture requirement, noting that the U.S. Supreme Court in *S.E.C. v. Edwards*, 540 U.S. 389, 397, 124 S.Ct. 892 (2004), had held that an investment contract for a fixed rate of return *can* be a security.

The Montana Supreme Court also reasoned that, as to the amount of control necessary to satisfy the four-part *Duncan* test for a security, there was currently a split in the federal circuits as to whether to look to the written contract or to the economic realities and the reasonable expectations by the investors. *Id.* at ¶45, 199 (citing *State v. Duncan*, 181 Mont. 382, 392, 593 P.2d 1026, 1032 (Mont. 1979)). In contrast with the district court's focus on the written contract, the Montana Supreme Court chose to follow the Second and Fourth Circuits, by defining the control element to mean the economic realities of the situation and "the investor's ability to *meaningfully* control the investment." *Id.* at 332

(citations omitted).

The fact that a state district court judge found AZ's legal argument in 2011 to be persuasive bears favorably on whether NYM's settlement stance was reasonable in 2011. Also favorable to NYM's reasonableness argument is the fact that there was no Montana case law on point at the time, and AZ had made a good faith argument for the direction that it thought Montana law should take. For our purposes in this case, the issue is not whether the Montana Supreme Court was correct in overturning the state district court on the legal question whether Redding's TICs were unregistered securities (although it does seem to me that the Montana Supreme Court opinion in the underlying case was absolutely correct in its rulings). Instead, the critical issue here is whether AZ had the right to obtain the Montana Supreme Court's decision at all, or whether AZ was legally required to have folded its tent and NYM was legally required to pay out policy limits when Redding made her demand 18 months earlier.

That AZ and NYM were ultimately proved to be wrong in July, 2012, does not detract from the reasonableness of their decision not to settle for policy limits 18 months earlier, when it was based on their genuine expectation that their legal arguments would prevail on the securities question. Because this question of law carried with it the potential for reducing the claimant's damages by half (if

favorable) or causing AZ to lose coverage (if unfavorable), getting a definitive answer to that question of law was extremely important to the insured, AZ.  It was important also because AZ knew that there were still other identifiable potential claimants who had not yet filed claims but who would be likely to argue that same question of law to their favor and to AZ's extreme detriment.  AZ knew that it had something like $12 million in potential claims (on a $2 million policy) that could rise as high as $30 million depending on this one question of law.  Of course the insured AZ wanted this question of law litigated to the end, and of course NYM was *obligated* not to abandon its insured as to this important defense.

Furthermore, AZ also had a good faith factual and legal argument as to a statute of limitations defense.  That summary judgment argument was apparently not addressed by the district court when it decided that the TICs were not securities.  However, the statute of limitations argument was another important ground upon which NYM based its decision not to settle with Redding.  Finally, at the time of Redding's demand, NYM had not yet received all the information it needed regarding Redding's income from the TICs, so NYM was unable to precisely calculate the amount of Redding's damages in February 2011.  Redding had declined to disclose her tax returns (presumably showing the TIC income stream), and that delay in the discovery process left NYM still waiting for an

expert evaluation of Redding's damages at the time of her demand. (Doc. 258-5, Jan. 11, 2011, HagEstad defense report to NYM, at 14-15 ("I will also likely file a Motion to Compel the production of Plaintiff's tax returns by the end of the month if Plaintiff refuses to supplement her discovery responses.").) Indeed, NYM's calculation of Redding's income did increase after her policy limits demand had expired (thereby reducing Redding's damages). As to this last point, NYM specifically requested an extension of time to respond to Redding's $2 million demand so that it could confidently calculate Redding's damages, but Redding rejected the proposed extension of time. Redding's 30-day demand period therefore expired on or about March 18, 2011. This is not a genuine issue of material fact, however, because whether or not Plaintiff's $2 million policy limit demand was still on the table, NYM still had a reasonable basis for declining to settle the case and the insured did <u>not</u> want to settle. (Doc. 259, Carlson Depo. I, 29:9-17.)

Liability was not reasonably clear, and numerous issues were unresolved that would have a significant bearing on liability and damages. Redding has failed to show by the high standard that is her burden that, as a matter of law, Montana's legal landscape at the time <u>required</u> NYM to settle with Redding in February 2011 for her $2 million policy limit demand.

The Montana Supreme Court recently reviewed the nature of the insurer's good faith duty to consider reasonable settlement offers within policy limits. *See State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, 418 ¶ 46 (Mont. 2013) (discussing Judge Jameson's seminal insurance bad-faith case of *Jessen v. O'Daniel*, 210 F.Supp. 317 (D. Mont. 1962)). The Supreme Court noted that failure to settle within policy limits is not automatically bad faith, even when hindsight reveals the insurer's error in judgment or when there is a verdict for plaintiff. *Id.* (citing *Jessen*, 210 F.Supp. at 325). Deciding an insurer's good faith is to "be made on a case-by-case basis." *Freyer*, 312 P.3d at 418. Essentially, bad faith must be proven by the plaintiff, and the Montana Supreme Court has held that "an insurer does not act in bad faith in rejecting a settlement if it had a reasonable basis in law or fact to contest the claim or the amount of the claim." *Freyer*, ¶ 47 (citing the holding of *Safeco Ins. Co. v. Ellinghouse*, 223 Mont. 239, 248, 725 P.2d 217, 223 (1986) ("[I]nsurer . . . will not be liable for the bad faith . . . if its position is not wholly unreasonable.").

Judge Jameson itemized six factors to be considered as to the common law bad faith determination, which are also relevant here:

> (1) whether, by reason of the severity of the plaintiff's injuries, any verdict is likely to be greatly in excess of the policy limits; (2) whether the facts in the case indicate that a defendant's verdict on the

issue of liability is doubtful; (3) whether the [insurance] company has given due regard to the recommendations of its trial counsel; (4) whether the insured has been informed of all settlement demands and offers; (5) whether the insured has demanded that the insurer settle within the policy limits; (6) whether the company has given due consideration to any offer of contribution made by the insured.

*Jessen*, 210 F.Supp. at 236-27. Applying these factors in this case, it was unclear that a verdict for Redding would have been "greatly in excess of the policy limits," but a defendant's verdict might have been doubtful as well. On the other hand, NYM did give due regard to the recommendations of MDS trial counsel, and in fact followed those recommendations faithfully. The insured AZ was informed of all settlement demands and offers and never asked NYM to settle Redding's claim before June 2012. NYM gave due consideration to AZ's $650,000 contribution when NYM determined that it would fund the settlement with the $4 million policy limits. On the whole, these factors do not indicate bad faith by NYM.

In her opposition brief, Redding asserts a straw-man argument when she claims that NYM has relied inappropriately on the "advice of counsel" to defend its decision to reject her policy limit demand. NYM has never utilized an "advice of counsel" defense in this case. Similarly, as to another of Plaintiff's straw man arguments, NYM never defended this case by asserting that every one of its actions were in the best interest of AZ (particularly with respect to the coverage

dispute).

MDS defense counsel did advise NYM in 2011 of certain legal and factual defenses upon which it could defend the underlying action. NYM did allow Redding's policy limit demand to expire because it believed it was entitled to do so. Now, in this bad faith lawsuit, NYM contends that it had a combination of both factual and legal defenses that provided it with a reasonable basis for allowing the offer to expire. Therefore, NYM relies on a "reasonable basis in law and in fact" defense, not on an "advice of counsel" defense.

In her summary judgment opposition brief, Redding criticizes NYM for not offering her $1 million to settle the case, asserting that if NYM thought that was what her claim was worth (citing Kush Depo., 50:7-11, 51:2-10), then NYM ought to have offered her that amount. Redding also asserts that "AZ was very clear that it wanted the claim to be settled within policy limits." (Doc. 264, Redding's Response Brief at 19.) This latter assertion by Redding is misleading.

However, the record shows that NYM really did not know with any certainty the value of Redding's claim in February-March 2011 because the law applicable to her claim was still unsettled and her damages were not yet calculable with any precision. (*See e.g.,* Doc. 258-7, March 8, 2011, HagEstad letter to Nikow, at 2-3; Doc. 258-8, March 11, 2011, HagEstad email to Nikow, at 2.; Doc.

259-7, March 18, 2011, Condra letter to Layne, at 2-3.)  On March 18, 2011, MDS

counsel Brad Condra informed Redding's counsel that

> [s]pecifically we still do not have any specific information or proof
> that the debt your client assumed in the purchase of her TIC
> properties was non-recourse debt.  Likewise, we are still awaiting
> supplemental responses to demonstrate what other income your client
> has received from the properties after 2008.  All of this information is
> critical to our evaluation of the case.  Based on your client's
> deposition testimony we are aware that other income has, in fact, been
> received.  Unfortunately, your client was not able to clarify the
> recourse/non-recourse issue and, as such, we must presume that she
> cannot prove it was recourse debt.

(Doc. 259-7, Condra letter to Layne at 2.)

Based on the record and all the evidence in this case, the Court determines

as a matter of law that NYM had a reasonable basis both in law and in fact to

reject Plaintiff's February 17, 2011, policy limit demand.  Therefore, NYM did not

breach either the statutory or common law duty of insurers to settle when liability

and damages are reasonably clear.

    2.    Whether NYM Conducted a Reasonable Investigation.

Redding asserts that NYM's claim adjuster Nick Nikow "had no experience

adjusting claims under Montana law and never requested an opinion or survey on

the applicability of the MUTPA [Montana Unfair Trade Practices Act, Mont. Code

Ann. §§ 33-18-101, et seq.].  Apparently, Redding believes that part of claims

investigation requires familiarity with Montana law, particularly the MUTPA. This is not what is generally understood by the requirement that an insurer conduct a reasonable investigation, and Redding cites no Montana law that requires such experience, opinions, or surveys. Redding asserts that Nikow did "absolutely no due diligence regarding HagEstad or his firm." (Doc. 264 at 22.) Redding mischaracterizes Nikow's testimony when she states that "Nikow also understood from the beginning that Ms. Redding's damages were in excess of the policy limits." (Doc. 264 at 22.) In fact, what Nikow said was that "[f]rom the materials that I had, I knew that Ms. Redding had made a large investment and that there were *allegations* of millions of dollars being lost." (Doc. 259-3, Nikow Depo., 24:2-5.)

Ms. Deola, as Redding's counsel, was able to obtain an opinion dated April 5, 2011, by the Montana Commissioner of Securities that the TICs were securities. This was used to bolster Redding's position during the summary judgment briefing in state district court in 2011. However, Deola both requested and obtained that opinion *after* Redding's policy limit demand expired and *after* the March mediation terminated. It was not part of the legal landscape at the time charged that NYM failed to settle with Redding. Furthermore, the opinion of the Commissioner of Securities did not persuade the state district court to grant

Redding summary judgment. Granted, the state district court decision was not part of the legal landscape either, but this court has no doubt that prior to the Montana Supreme Court decision in July, 2012, reasonable minds could differ as to whether, in Montana, the DBSI TICs were or were not securities. The issue in this case is whether AZ and NYM had the right to litigate this question (among others) in a state court of law, and it was a legal question that was crucial and freighted with heavy consequences for the insured AZ. Another way to view the question is whether NYM was <u>required</u> to abandon the best interest and the desires of its insured and instead adopt Redding's viewpoint or face the punishment of the erasure of the policy limit. Furthermore, Redding's argument that NYM was remiss in not seeking an opinion by the Montana Commissioner of Securities fails in the face of AZ and NYM's decision to seek an opinion by a Montana court.

Thus, Redding criticizes NYM for not performing investigations that were not required of it by Montana law. NYM did conduct its own investigation of Redding's claim, as did AZ's defense counsel. Experts were obtained, discovery was had, and defense counsel reported regularly and in depth on the progress of the case. The claims adjuster, Nick Nikow, was an attorney with over thirty years of experience in the insurance field as a corporate counsel, claims specialist, claims counsel, and claims adjuster. (Doc. 259-3, Nikow Depo. at 6-11.) When

Redding's claim was filed, Nikow immediately spoke directly with Gary Carlson, chief operating officer of AZ to understand AZ's circumstances and to understand the claim. (Doc. 258 at 18.) Nikow was attentive to the work of defense counsel and was himself actively involved with the case. Montana law allows an insurer to rely on defense counsel's investigation of a claim. *See Ensey v. Colorado Casualty*, 30 P.3d 350 (Mont. 2001).

A claim that an insurer has failed to conduct "a reasonable investigation based upon all available information" before refusing to pay an insurance claim is premised upon Mont. Code Ann. § 33-18-201(4). NYM did not ignore any information provided by its insured. *See Revelation Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 926 (Mont. 2009) ("insurers are not entitled to simply ignore factual information supplied to them by their insureds"). NYM did not fail to obtain any of the basic information related to the case, such as would compare to the failure to obtain a police report in a case involving a traffic accident. *See Shilhanek v. D-2 Trucking, Inc.*, 70 P.3d 721 (Mont. 2003). It is clear that by the time that Redding made her policy limits demand, the insurer was aware through frequent defense counsel reports that defense counsel had obtained an expert's opinion as to the securities issue, was engaging in discovery, and, in fact, had begun preparing motions to clarify the law of the case and the amount of

damages.  Redding's assertion that NYM did not investigate the claim in the same way that she investigated and prepared her claim for litigation is not the correct test for a reasonable investigation by an insurer under Montana law.

      3.      Whether NYM Made A Good Faith Effort to Promptly Settle Ms. Redding's Claim.

Redding claims that NYM failed to make a good faith effort to promptly settle her claim by failing to offer her at least $1 million (the NYM preliminary estimate of valuation of Redding's claim) at the March 23, 2011, mediation. While it is true that NYM and MDS counsel went into the March 23 mediation hoping that they could settle Redding's claim for $1 million or less (Doc. 259-6, Kush Depo. 50:8-18), they were not under any legal duty to do so because they did have a reasonable basis in fact and in law for continuing their litigation.  In fact, Kush testified that, going into the March 23 mediation,

> the amount of damages was uncertain. . . . There was a lot of discovery that was outstanding and, in our mind, those damages had not yet been proven, but we were still willing to come to the table and negotiate a settlement without those damages having been proven.

(Doc. 259-6, Kush Depo. 51:14-22.)

As to Redding's misleading statement (noted above) that in early 2011 AZ wanted to settle within policy limits (Doc. 264 at 19), the record shows that AZ did *not* want to settle with Redding.  It was MDS counsel Brad Condra–not AZ--

who said that AZ wanted to settle Redding's claim, and Condra's assertion was later disavowed by AZ.  (Doc. 267-1 at 7.).  Gary Carlson, the chief operating officer of AZ, denied that AZ wished to settle at any time in 2011--within policy limits, in any amount, or at all.  (Doc. 259, Carlson Depo. I, 29:12, 17; 32:13 ("We did not request that they settle it."); 39:9-18.)  Carlson testified that Condra's conclusion in his February 23 memorandum (*i.e.*, that "our clients [AZ] believe this case should be settled") was merely Brad Condra's opinion, not the actual desire or the position of AZ in 2011.  (Doc. 259, Carlson Depo. I, 38:22-39:2 ("That was Brad Condra's conclusion.").)

Furthermore, NYM did not really get the chance to negotiate in good faith because the mediation was terminated early after Redding demanded over three times the amount of the policy limit, and it was not NYM's decision to terminate the mediation but that of the mediator Stuart Kellner.  None of the factual questions amount to a material fact that would preclude summary judgment, however, because NYM had a continuing reasonable right to litigate questions of law, fact, and damages.

E.     Whether NYM Failed to Agree Promptly to Fund the Settlement.

Redding asserts that NYM acted in a dilatory manner.  The operative dates are as follows:

> June 5, 2012, Redding accepted AZ's offer to settle;
> June 15, 2012, AZ's defense counsel inform NYM of the settlement agreement;
> June 30, 2012, NYM agrees to fund its share of the settlement;
> July 27, 2012, NYM delivers $4 million to Linda Deola.

The bare facts just outlined do not suggest more than the merest scintilla of evidence that NYM improperly delayed its agreement to fund or to actually distribute the $4 million to plaintiffs' counsel.

Redding asserts that a "reasonable inference from this undisputed evidence [can be made that] NYM was aware of the global settlement by at least mid-May 2012."  Such an inference is unreasonable; this assertion is but a half-truth.  On May 22, 2012, NYM claims adjuster Nikow noted in the claims file that he "[s]poke to DC [defense counsel] who reports that Plaintiffs' attorney may want to bundle all six claims and settle them presumably under this file and policy.  I have asked DC to confirm and report his findings to me."  (Doc. 258 at 9, NYM00003254.)  When Deola presented her demand for each of her six clients on May 25, 2012 (Doc. 259-9 at 2), HagEstad wanted to know if this was going to be a global settlement including all seven claimants.  (Doc. 259-4, HagEstad Depo.

95:9-18.)  Deola was encouraging.  (Doc. 259-4, HagEstad Depo. 102:7-10.)

Thus, the idea for the global settlement was not NYM's, and by May 22, 2012,

NYM only had an inkling that a global settlement might be in the offing.

Redding claims that NYM delayed payment after she agreed to settle with

AZ on June 5, 2012, but NYM asserts that it did not even know about the

settlement.  When Deola deposed HagEstad, she specifically asked him, "did you

ever tell Mr. Nikow that the plaintiffs had agreed to accept $4.65 million before

ProSight agreed to pay $4 million?"[6]  (Doc. 259-4, HagEstad Depo. 196:4-7.)

HagEstad answered, "Did I ever tell Nick that the plaintiffs had agreed to accept

the 4.65?  I think that my discussions with Nick were I think that plaintiff would

take it."  (Doc. 259-4, HagEstad Depo., 196:8-11.)  When Deola repeated the

question, HagEstad responded, "No I think it was always, I think, I have a good

feeling kind of stuff."  (Doc. 259-4, HagEstad Depo.,196:8-11.)  HagEstad told

Deola in his deposition that, "you alleged to have accepted an offer [for $4.65

million on June 5]."  (Doc. 259-4, HagEstad Depo. 200:2-3.)  When Deola

---

[6]  This question asks whether AZ's defense counsel ever told NYM that AZ
had negotiated a settlement with the plaintiffs, *without the insurer's knowledge*
and *before the insurer had determined the extent of AZ's coverage*.  Given his
primary duty to represent the interests of AZ, it is not surprising that HagEstad
proceeded cautiously in his reports to NYM.  AZ's insurance policy required AZ
to cooperate with NYM in effecting settlements.  (Doc. 253-1, NYM Policy
CG102917 (9/30/08-9/30/09), ¶ 9.5, NYM 0000068.)

challenged HagEstad's choice of words, HagEstad repeated, "You alleged to have

accepted." (Doc. 259-4, HagEstad Depo. 200:12.) He explained further, "Because

there wasn't an offer out there for that." (Doc. 259-4, HagEstad Depo. 200:14-

15.) Upon further challenge, HagEstad stated, "we have not made an offer."

(Doc. 259-4, HagEstad Depo. 201:1.) When challenged further, HagEstad stated,

"I did not make a $4.65 million offer." (Doc. 259-4, HagEstad Depo. 202:19-20.)

Again, HagEstad stated, "I do not believe that I had extended or authorized any

offer in that amount." (Doc. 259-4, HagEstad Depo. 203:2-4.)

Deola continued to assert that NYM knew all about AZ's $4.65 million

offer. She confronted HagEstad with Curt Drake's email dated June 3, 2012.

(Doc. 270-3 at 1.) In this email, Drake tells Deola that

> we may have a settlement *pending approval by your clients*. I think
> Patrick [HagEstad] is awaiting ProSight's [NYM's] confirmation
> about what it will pay, so we have a couple of key pieces to get before
> we know if we have something viable. I've been tasked with trying
> to take a first run at a settlement agreement/release. If you have any
> thoughts about provisions that need to be included that I need to be
> thinking about--let me know. I'll of course be sending it out for your
> review and comment when I get a draft.

(Doc. 270-3 at 1 (emphasis added).) Redding asserts that this email provides

evidence that, as of June 3, NYM knew that AZ had offered a global settlement of

$4.65 million. The point of her assertion is to prove her contention that NYM

delayed agreeing to fund the settlement from June 5 to June 30 and delayed payment until July 27.

Even if accepted at face value, this evidence is insufficient to show bad faith. It is insufficient to show delay. It is also insufficient to show that NYM actually knew on June 3 that AZ had offered Deola $4.65 million to settle. It is perfectly consistent with all the other evidence that indicates that NYM had been cut out of the information loop regarding Drake-Deola negotiations. During HagEstad's deposition, Deola asked him, "you have no idea what he's talking about there [in Drake's June 3 email], is that what you are saying to me?" (Doc. 259-4, HagEstad Depo. 203:21-23.) HagEstad responded affirmatively: "Yes [that is what I am saying to you], I did not think that we were that far at that time. (Doc. 259-4, HagEstad Depo. 203:24-25.) Drake's June 3 email is the proverbial scintilla of evidence that will not preclude summary judgment.

When AZ and Redding were close to settlement, Drake began circulating a draft settlement and release agreement. HagEstad found this process to be confusing: "when I thought we were heading in one direction then there would be something else." (Doc. 259-4, HagEstad Depo. 199:2-3.) One particular "something else" was that HagEstad noticed the topic of "assignment" had arisen. HagEstad thought, "geeze, now we're on here, we're going this way now." (Doc.

259-4, HagEstad Depo. 199:8-9.) HagEstad tried to understand what was

happening so that he could both "advise my client [AZ] and I could advise [NYM]

at least to let them know what was going on." (Doc. 259-4, HagEstad Depo.

199:10-12.)

In fact, Deola's email to Curt Drake, dated June 4, 2012, reveals that she

*knew on the day before she accepted AZ's offer* that she and Drake were

discussing entering into a confession of judgment/covenant not to execute, which

by definition is an unconsented settlement agreement not approved by the

insurance company, in this case NYM, who will then be sued by the claimant for

first- and third-party bad faith claims:

> Curt:
> Me again, sorry I didn't also mention that in order to preserve are
> [sic] claims we would want what we call a "Mary Carter" letter.[7]

---

[7] Deola stated in her second deposition that the reference to a "Mary Carter" letter was "a term Mike Layne was using. I don't actually think that's what he meant in hindsight." (Doc. 259-11, Deola Depo II, 72:22-73:1.) Deola testified that, instead of a Mary Carter agreement, she was simply referring to a confession of judgment/covenant not to execute agreement. (Doc. 259-11, Deola Depo. II, 73:1-6.) A "Mary Carter" agreement (sometimes taking the form of a loan agreement) apparently is an agreement whereby the plaintiff settles with one defendant for some minimal amount but agrees to reduce the settling-defendant's financial obligation by whatever amount that plaintiff can recover from a nonsettling defendant. *See Booth v. Mary Carter Paint Co.*, 202 So.2d 8 (Fla. Dist. Ct. App. 2d Dist. 1967). Generally, a Mary Carter agreement is kept secret from the non-settling defendant. Courts have required disclosure of Mary Carter agreements because the litigation process can be skewed by it. "These settlement

> That is, in exchange for releasing the AZ defendants we would seek a confession of judgment from AZ for the full amount of the policies (I don't know that number of [sic] the top of my head)  In exchange for the confession of judgment by AZ, my clients would execute a covenant not to execute above the settlement amount.
> Lin Deola

(Doc. 217-8 at 4.)  The gist of this email indicates that, at the time plaintiff's counsel accepted AZ's $4.65 million offer, *plaintiff's counsel did not expect NYM to pay*.  Instead, this arrangement between Deola and Drake called upon AZ to confess judgment in the "full amount of the policies."  Significantly, Deola did not disclose this email to NYM in discovery.  When asked why she had not produced it, Deola testified that she did not know why she had not produced this email in discovery.  (Doc. 259-11, Deola Depo. II, 71:16-22.)  All written communications regarding settlement between opposing counsel in the underlying litigation should have been disclosed to NYM.  The failure to disclose emphasizes that NYM was kept in the dark.

By June 6, NYM believed that the parties were in the early stages of

_____

agreements give the settling defendant a motive to advance the plaintiff's cause by giving the defendant a financial interest in the outcome.... This incentive could . . . color testimony." 3 Bus. & Com Litig. Fed. Cts. § 33:105 (3d ed.).  In the context of this case, if the underlying parties were to have entered into a Mary Carter agreement, the settling defendant would have been AZ and the non-settling defendant would have been NYM in this bad-faith case.

The record does not disclose whether a Mary Carter agreement was executed by Redding and AZ.

negotiating a settlement, when in fact a settlement had been reached. Nikow believed that he was waiting for further information from MDS counsel to help NYM finally determine its coverage and funding of any settlement.

On June 15, 2012, MDS counsel sent a defense report to NYM providing its final analysis of all the claims. In this report, HagEstad informs Nikow of "Lin Deola's final demand for $4,650,000 to globally settle claims made by Redding, Buckingham, Bailey, Garrison Ranches, Chevalier Ranch Company, Richard Thieltges and Thieltges Farms, Inc., and Schindler Livestock." (Doc. 258-15 at 2.) The letter did not inform NYM that AZ had in fact already agreed to the $4.65 million demand. Instead, it simply stated that "Plaintiff contemplates AZ putting in $650,000...." (Doc. 258-15 at 2.) Apparently because coverage was not yet settled from NYM's perspective--and HagEstad knew that, the letter states that "she [Deola] believes Prosight [NYM] has at least two $2,000,000 policies relevant to the claims...." (Doc. 258-15.)

Taking HagEstad's testimony together with this sole formal notice to NYM, there is no evidence in this case that NYM was aware of the $4.65 million settlement until June 15, 2012.

In response to this new information on June 15, Nikow requested reports for all pending claims, one of which was only one week old. (Doc. 258 at 7 ("DC

83

[defense counsel] is providing more reports.") On June 19, 2012, Nikow notes that "DC has stated that situation is tense and taht [sic] AZ personal attorney has agreed to contribute $650K. He wants answers by the 22nd of June, whether we will put up $4,000,000 to settle all the litigation." Nikow received the reports from MDS counsel on June 20. (Doc. 258-26, -27, -28, -29, -30; Doc. 258 at 7.) Nikow requested more time to evaluate Deola's $4.65 million demand. (Doc. 258 at 6.) Nikow received a one week extension on June 22. (Doc. 258 at 6.) On July 2, 2012, Nikow notes that the cases against AZ "have settled for $4.65M. Will call Dc [redacted] as to details as to going forward The two policies (2008 and 2010 POLICIES) which were triggered will effectively be exhausted, and the Tvetne matter in the 2009 year will remain viable." (Doc. 258 at 5.)

On June 26, 2012, HagEstad was hospitalized with a heart attack, and he dropped out of the case as AZ's lead defense counsel, to be replaced by MDS associate Brad Condra. During his deposition, Brad Condra testified that when he stepped into the lead counsel role, there was no settlement in the case yet: "We didn't have a settlement when I stepped into the -- when I sat down on the saddle as it were, after Patrick's heart attack, we still didn't have anything more than a framework that we were working on as I understood it." (Doc. 259-5, Condra Depo. 78:5-9.)

On June 29, 2012, ten days after learning about Deola's demand for $4.65 million, NYM agreed to fund two policies limits, as requested by Deola, in the amount of $4 million. (Doc. 259-21, at 6 (DL 079); Doc. 259-22 at 12.) Nikow continued to maintain that only one policy limit was owed, but he approved the settlement anyway. (Doc. 259-3, Nikow Depo. 70:7-71:14; Condra Depo. 90:19-23.)

What occurred next was the ironing out of the settlement and release agreement, and the resolution of the coverage dispute, which is not in itself actually pertinent to this lawsuit, although Plaintiff now characterizes NYM's coverage negotiations with AZ as somehow reflecting NYM's bad faith toward her. However, that conflict between NYM and AZ sheds little to *no* light on NYM's conduct in settling Redding's claim.

Apparently, at least initially, Redding did not plan to release either AZ or NYM (although she was still considering entering into a side agreement with AZ that she would not execute against AZ's assets as to any of her claims). Ultimately, Redding and all the other claimants agreed to release AZ. (Doc. 259-20 at 3-4, ¶ 4.) However, Deola adamantly refused to release NYM. NYM inquired what claims Deola might be planning to assert against NYM in the future.

NYM threatened to pay the $4 million under reservation of its rights against

AZ (which, in fact, NYM did do).  (Doc. 259-27 at 3.)  NYM also refused to settle the coverage suit filed against it by Curt Drake on behalf of AZ unless AZ agreed to indemnify NYM against future (*i.e.,* bad faith) claims asserted against it by the claimants.  Ultimately, NYM made the $4 million payment to the underlying claimants under reservation of its right to litigate the coverage action to determine whether there was or was not coverage under any of AZ's policies.  That reservation of rights was apparently nullified when AZ settled its coverage action with NYM and AZ agreed to indemnify NYM for any claims arising from the policies in the future.

Redding asserts now, in the instant case, that NYM's conduct post-settlement constitutes bad faith.  Redding claims that "NYM (vis-a-vis Goodman) nearly undermined the settlement, and threatened to sue AZ if it would not sign a release *[in the coverage action]*."  (Doc. 264, Pl.'s Response Brief at 27.)  Whether true or not, this assertion does not have anything to do with this case.  Whatever happened between NYM and AZ in July, 2012, is irrelevant because the settlement agreement was finalized in June, 2012.  No alleged undermining succeeded.  Payment was made in July.  In July, 2012, Redding could not have been damaged; nor could NYM have violated Montana's Unfair Trade Practices Act.  Redding's puffing about not being paid for three weeks in July while AZ and

NYM settled their coverage suit is entirely unpersuasive because <u>NYM paid within Redding's own deadline</u>.

NYM offered through its coverage counsel to make the $4 million payment "under full reservation of its rights, including the right to recoup from the insureds any and all amounts paid under the policy to defend or indemnify the insureds, which would include the $4 million settlement payment." (Doc. 259-21 at 6.) AZ apparently did not think that offer looked very attractive, and it took several weeks for AZ and NYM to come to an agreement. Whether that agreement was favorable or unfavorable is irrelevant, and certainly a three-week delay was reasonable given the seriousness of the coverage dispute between AZ and NYM. Redding's accusation that NYM's coverage counsel engaged in "strong-arm tactics" (Doc. 264 at 27) is entirely undone by this record.

F.      Whether NYM Demanded a Global Settlement.

Plaintiff claims that NYM has back-tracked on its assertion that the global settlement was Linda Deola's idea, quoting NYM's Statement of Undisputed Fact No. 67: "Indeed, the idea to settle all of the claims or none of the claims was AZ's." ((Doc. 264 at 28, citing NYM's SUF Doc. 257 at 32.) Plaintiff believes that by contradicting itself, NYM has created a genuine issue of material fact. Plaintiff's counsel misreads NYM's SUF No. 67. NYM is stating that it was AZ's

idea to obtain settlements with all other plaintiffs. This is not inconsistent with NYM's contention (*see* SUF No. 66, Doc. 257 at 32) that Deola encouraged the idea of a global settlement when HagEstad asked her if she was contemplating a global settlement. AZ may have communicated the idea of a global settlement to Deola through its coverage counsel, Mr. Drake, but his actions cannot be imputed to NYM, for he was adversarial to NYM.

It is Redding's burden to prove her allegation that NYM demanded a global settlement agreement. Redding claims that NYM withheld prompt settlement with Redding (under a condition of reasonably clear liability) under the 2008 policy in order to influence settlement of the other claims under the 2010 policy, in violation of Montana's anti-leveraging statute, Mont. Code Ann. § 33-18-201(13). However, the evidence is clear that the global settlement was not instigated by NYM. NYM did not violate MCA 33-18-201(13), as is alleged in Plaintiff's Amended Complaint, Doc. 7, ¶ 29, by refusing to settle "under one portion [Redding's] of the insurance policy coverage in order to influence settlements under other portions [the other claimants] of the insurance policy coverage." *See Ridley v. Guaranty Nat. Ins. Co.*, 951 P.2d 987 (Mont. 1997) (a leveraging violation takes place when the insurer withholds settlement as to an *undisputed* claim for which liability has become reasonably clear in order to obtain settlement

of disputed claims).  In this case, defense counsel reasonably believed at all times that liability was not reasonably clear.  (Doc. 259-4, HagEstad Depo. 9:5-15.)  Instead, NYM considered the global settlement proposal that AZ desired and Deola "encouraged" HagEstad to think was possible.  (Doc. 259-4, HagEstad Depo. 102:7-11.)

Redding supports her leveraging claim with a June 1, 2012, email from Drake to one of the individual defendant's counsel:

> I spoke with Pat [HagEstad] a few minutes ago.  He said [NYM] did not extend the $4M in authority--only said they 'would consider' doing so if the claims could all settle with that payment.
>
> He's going to try and reach [NYM] and see if they will extend the $4M to us to work with in negotiations this afternoon, since their business day will conclude in 45 minutes back east.  Don't hold your breath on that last one....
>
> Lin also told Pat in a recent call that they won't make any firm demands until they see the financials.  I'm asking A-Z now if they will authorize that disclosure.

(Doc. 265-3 at 7.)  The email does not state or indicate that the insurer would refuse to fund a singular undisputed claim if asked to do so, which would be the essence of the leveraging claim.  This email is therefore insufficient to demonstrate a genuine issue of material fact because the email is consistent with NYM's assertion of undisputed fact No. 67--that NYM did not force a global

settlement upon the parties.  (Doc. 257 at 32, ¶67.)

In addition, there are a number of problems with this email and the leveraging claim itself.  First, Plaintiff has not presented any Montana case holding that (1) if the *insured* decides that it wishes to settle *simultaneously* with multiple claimants, as was obviously the case here, then (2) the *insurer* is precluded from supporting its insured and allowing defense counsel to negotiate a global settlement with all claimants.  Second, this email contains a hearsay statement brought for the purpose of proving the truth of the hearsay statement contained therein, which only underscores the weakness of Plaintiff's evidence as to the leveraging claim.  *See* Rule 802, Fed.R.Evid.; *see also* Fed.R.Civ.P. 56(c)(1)(B), (c)(2).  Third, it is Plaintiff who bears the ultimate burden of persuasion as to her leveraging claim and who has failed to satisfy her burden to meet the summary judgment challenge.  Drake's June 1, 2012, email is not enough to prove Plaintiff's leveraging claim. By itself, it is insufficient and no more than a scintilla of evidence.

In addition, the leveraging claim itself is implausible because Plaintiff provides no explanation why NYM would care whether policy limits were to be shared by 1, 2, or 7 claimants--exhaustion of the policy limits would have extinguished NYM's obligations, regardless whether by a single settlement or by a

global settlement. The only party that would care would be AZ. There was no logical reason for NYM to force an unwanted global settlement. Testimony from AZ makes clear that, when AZ finally decided it needed to settle seven nearly identical claims, AZ--quite naturally--desired to settle all the claims at one time in a global settlement.

Even if the facts in this case could ever satisfy the elements of a bad faith insurance leveraging claim, the person or party who actually instigated the global settlement proposal matters little as long as it was not instigated by NYM for the purpose of leveraging an undisputed claim to obtain settlement of disputed claims. Redding's claim was not undisputed, liability was not reasonably clear, and the record shows quite clearly that NYM neither instigated nor forced the global settlement. Rather, the parties were all quite willing to entertain a global settlement proposal, and no party objected to it.

G.      Conclusion as to Summary Judgment Motion.

Defendant NYM has shown that there are no genuine disputes as to any material fact and that it is entitled to judgment as a matter of law. NYM conducted a reasonable investigation of Redding's claim, NYM had a reasonable basis in law and in fact for contesting Redding's claim and the amount of her claim, NYM did not leverage an undisputed claim in order to obtain the settlement

of disputed claims, and NYM did not delay its approval of the settlement or its payment of the policy limits. There are no genuine issues of material fact that should preclude summary judgment in this case. The motion will be granted.

## III. Defendants' Motion to Strike Plaintiff's Statement of Disputed and Additional Facts.

In opposition to Defendants' Motion for Summary Judgment, Plaintiff has submitted a Statement of Disputed Facts (Doc. 265). Defendants object because it invites consideration of documents not produced in discovery, documents that are not Bates-stamped, and documents not accompanied by an authenticating declaration as required by Rule 56(e), Fed.R.Civ.P. Defendants complain that some of Plaintiff's so-called disputed facts are based upon multiple layers of hearsay drawn from unauthenticated documents or documents not produced in discovery. Defendants also point out that Plaintiff fails to cite to a specific pleading, deposition, answer to interrogatory, admission or affidavit to oppose each fact she disputes, as is required by Local Rule 56.1.

The Court has already considered Plaintiff's evidence underlying her Statement of Disputed facts and found that evidence to be lacking on multiple levels. Much of the evidence that she relies upon is inadmissible, but even if it were admissible it would amount to a scintilla, no more. In fact, one of the

primary examples of hearsay upon which Plaintiff particularly seeks to rely has already been considered by the Court and found to be no more than the proverbial scintilla of evidence and fundamentally flawed on multiple levels. (*See* Doc. 265 at 49, ¶ 67; *see also supra* at 89-90, discussing various weaknesses in Plaintiff's use of Drake's June 1, 2012, email (Doc. 265-3 at 7).) Plaintiff fails to meet the requirements of Local Rule 56.1(b)(1)-(2) in her Statement of Disputed Facts in that she does not cite to specific pleadings, depositions, answers to interrogatories, admissions, or affidavits. On that basis alone, the motion to strike is well taken. However, the Court has already considered all of this evidence, and therefore the Motion to Strike will be denied as moot.

## IV.   Defendants' Motions for Fees and Costs.

Before the Court are two requests by NYM for attorney fees and costs. The first pertains to Redding's motion to disqualify Defendants' counsel (Mark Goodman), which was deemed filed for a retaliatory purpose and to harass opposing counsel. This Court found in its June 10, 2014, Order (Doc. 237) that the "motion seems patently frivolous...." (Doc. 237 at 3.) The second request for attorney fees and costs pertains to NYM's motion to compel discovery. I stated at the June 10, 2014, hearing that I would hear the first request for attorneys fees at the same time as Defendant's second request for attorney fees. (Doc. 244, 6/10/14

93

TR 34:5-12.)  The Court heard argument from the parties on both requests for

attorney fees on September 19, 2014.  (Doc. 298, 9/19/14 TR 33:9-38:9.)

The Court will grant fees and costs to NYM in both instances.

The Court utilizes the lodestar method for determining reasonable attorney

fees.  *See Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013).  The

computation is the reasonable number of hours multiplied by a reasonable hourly

rate.  *Sorenson v. Minsk*, 239 F.3d 1140, 1145 (9th Cir. 2001).  The Court also

considers the 12 *Kerr* factors.  *See Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67,

69 (9th Cir. 1975).

Plaintiff's counsel, who never offered to settle the fee award, asks that the

Court set the lodestar for attorney fees at the Montana rate exemplified by NYM's

local counsel, Gary Zadick, which is a rate of $250 per hour.  Defendants object to

applying that rate to their San Francisco counsel, and point out that, even under

Montana law, the going rates for counsel in communities outside Montana can be

considered when it is reasonable to do so.  *Ihler v. Chisolm*, 995 P.2d 439, 445

(Mont. 2000).  Defendants believed that their out-of-forum attorneys were

necessary because counsel were familiar with them and with their case.  It was

reasonable under all the circumstances for Defendants to have engaged these

counsel, especially since they are excellent attorneys and have proven their

94

capability in this case.

While the lodestar is generally applicable, an exception is made for sanctions imposed upon contumacious and contentious counsel acting in bad faith. The out-of-forum rate (or more precisely, the differential between the local rate and the out-of-forum rate) is both sanction against attorney misconduct and partial restitution to NYM for fees that it must unnecessarily pay. In this case, defense counsel Mark Goodman's established rate is $525 per hour, and Michelle Alborzfar's rate is $450 per hour.

A.    NYM's Fees Incurred Responding to Plaintiff's Motion to Disqualify Counsel Mark Goodman.

The Court's inherent powers allow it to "protect[] the due and orderly administration of justice and maintain[] the authority and dignity of the court." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (citing *Cooke v. United States*, 267 U.S. 517, 539, 45 S.Ct. 390, 395-96, 69 L.Ed. 767 (1925)). To sanction under inherent powers, the Court must make "an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith." *Id.* (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767, 100 S.Ct. 2455, 2465, 65 L.Ed.2d 488 (1980)). A finding of bad faith is appropriate when an attorney "knowingly or recklessly raises a frivolous argument, or argues a

meritorious claim for the purpose of harassing an opponent." *Batarse*, 115 F.3d at 649 (quoting *In re Keegan*, 78 F.3d 431, 436 (9th cir. 1996)).   Reckless actions combined with frivolousness, harassment, or an improper purpose" will justify sanctions under inherent powers.  *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001).  This conduct is "more egregious than mere negligence or recklessness."  *In re Lehtinen*, 564 F.3d 1052, 1058 (9th Cir. 9th Cir. 2009) (quoting *In re Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2003)).  Sanctions derived from a court's inherent powers can be imposed against attorney, client, or both.  *See Cannon v. Loyola Univ. of Chicago*, 784 F.2d 777, 782 (7th Cir. 1986).  This Court has considered other local awards.  *See e.g., Lasar v. Ford Motor Company*, 239 F.Supp.2d 1022 (D. Mont. 2003), *aff'd in part and rev'd in part*, 399 F.3d 1101 (9th Cir. 2005) (affirming sanction of $61,397.50 attorney fee).

The Court found Plaintiff's motion to disqualify Goodman to be "patently frivolous" primarily because Goodman appeared in the underlying litigation as secondary coverage counsel to NYM and only *after* a final settlement was reached between the claimants and AZ.  He wrote only two emails to AZ regarding post-settlement matters.  (Doc. 163-2; Doc. 265-6 at 24-25.)  The record before the Court discloses no other contacts by Goodman with the attorneys in the Underlying Litigation.

The timing of the motion also exhibits its frivolity. On October 25, 2013, NYM notified Plaintiff's counsel Deola by email that it intended to file a motion to disqualify her as counsel since she was a necessary witness in this case. A few minutes later, Deola sent out this reply email:

> I assume you will similarly object to our motion to disqualify you [M. Alborzfar] and Mark given your documented participation in the settlement of the underlying cases and Mr Nikows  testimony that Mark was retained as coverage counsel during the pendency of the underlying action?

 (Doc. 193-2 at 2.) This was tit for tat, and the threat of retaliation. Months later, after NYM's motion to disqualify Deola was briefed, heard, and granted, Deola's partner, Mr. Brian Miller, appeared as counsel of record and lost no time in filing the retaliatory motion--just as had been threatened by Deola six months earlier. Deola gave this reason to NYM to explain why Mr. Miller would be filing the motion to disqualify lead defense counsel Goodman:

> He [Goodman] is a key witness to the defense raised by defendants that NYM acted in AZ's best interest. Evidence rebutting this defense was effectuate [sic] through him [sic]

(Doc. 193-4 at 2.) As with so many of Plaintiff's arguments, Ms. Deola sets up a straw man by misrepresenting NYM's defense and then using that misrepresentation to justify Mr. Miller's frivolous motion to disqualify Goodman.

Fully informed then, the Court found Plaintiff's motion to disqualify was

"patently frivolous" and filed for the purpose of retaliation.  Filing such a motion is tantamount to bad faith.  Sanction for the filing of such a motion therefore falls within the Court's inherent powers, and an award of attorney fees and costs is an appropriate sanction.

NYM now requests reimbursement in the amount of $213,705.21, which includes $1,792.32 in costs.  This request covers defense counsel's brief in response to the motion to disqualify Goodman, the motion to quash Goodman's subpoena, and the brief in response to Plaintiff's motion to supplement the motion to disqualify, as well as travel to and appearance at the hearing thereon.  The Court will order reimbursement for NYM's principal counsel (Goodman, Alborzfar, Zadick) as to the motion to disqualify Goodman, motion to quash subpoena of Goodman, and hearing of the motion, but it will order that only principal counsel's fees and costs be paid as requested, in the total amount of $73,934.82.  The itemization of attorney fees requested indicates possible overstaffing and inordinate amount of time spent in research; the time expended by the contract attorney (40.3 hours), and paralegal (95.1 hours) exceeded what was necessary to respond to Plaintiff's motions. The sum of $73,934.82 represents a reasonable reimbursement to NYM for the lost opportunities for employment of the defense team, for the fixed nature of defense counsel's reimbursement, for the high

importance of the motion to NYM given Mr. Goodman's position as lead defense counsel and the late stage of the proceedings, and for the undesirability of the work itself, *i.e.*, responding to a frivolous and retaliatory motion.

B.     NYM's Fees Incurred to File Motion to Compel Discovery.

Rule 37(b)(2)(c) provides that if a party fails to obey a discovery order, "the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed.R.Civ.P. 37(b)(2)(c) (emphasis added).

Defendants' second request for attorney fees pertains to Defendants' motion to compel additional discovery and for contempt and monetary sanctions (Doc. 213, 215.)  The Court heard argument on the motion to compel on June 23, 2014. The Court found in its written order that "Plaintiff did do all these things and did delay and obstruct the progress of discovery."  (Doc. 262, July 2, 2014, Order at 20.)  The Court found that Ms. Deola failed to produce documents responsive to the Court's February 3, 2014, Order (Doc. 114), failed to adequately search for documents in response to Defendant's requests (failing to provide important emails between plaintiff's counsel Deola and opposing counsel Drake), failed to

prepare adequately to testify at her first deposition, prevented Defendants' from questioning her at her first deposition about her handling of the settlement funds when she was directed to do so by the Court's Order (Doc. 114 at 7), and prevented Defendants from questioning her at her deposition about her communications with opposing counsel regarding the settlement. (Doc. 262 at 19-20.) The Court stated that "Plaintiff's failure to cooperate in discovery was not substantially justified...." and the Court was unaware "of any circumstance that would make an award of Defendant's attorney fees and costs unjust." (Doc. 262 at 24.) The Court concluded "that an award of attorneys' fees and costs attributable to the bringing of Defendants' motion to compel additional discovery, appearing for the June 23 hearing, and conducting the second deposition is justified on this record, and it will be so ordered." (Doc. 262 at 24.) The Court gave the parties 10 days to agree on Defendants' attorney fees and costs "attributable to the Motion to Compel Additional Discovery, the hearing thereon, and Ms. Deola's second deposition." (Doc. 262 at 25.) The Court specified that this monetary sanction would be paid to Defendants "by Plaintiff and her counsel." The Court instructed Defendants to file a motion if the matter could not be settled between the parties.

Because the parties could not arrive at a stipulated amount, NYM filed a motion for attorney fees and costs (Doc. 285), supported by a declaration (Doc.

287) that provides an itemized breakdown (by individual and by topic) of hours

and costs in support of their request for $66,095 in attorneys' fees and $1,810.22

in costs, for a total of $67,905.22. This request for attorney fees and costs relates

to NYM's motion to compel, attendance at the hearing, and taking of Deola's

second deposition. NYM also states that its counsel incurred $34,411.50 for the

preparation and filing of the motion for fees and costs itself (not inclusive of

future time spent preparing the reply brief), citing *Clark v. City of Los Angeles*,

803 F.2d 987, 992 (9th Cir. 1986) (argument that no fees recoverable for

preparation of fee petition is frivolous). Thus, the actual total of attorneys fees

and costs attributable to Plaintiff's multiple discovery violations is $102,316.72.

I will award attorney fees as requested by the three lead/local defense

counsel for a total fee of $32,122.50, plus $1,810.22 in costs, for a total award of

$33,932.72. I find the reimbursement request for a junior associate (41.5 hours), a

contract attorney (8.6 hours), and a paralegal (35.5 hours) to be unnecessary hours

devoted to researching the motion to compel discovery. Nor was NYM successful

as to every item of discovery sought to be compelled.

Although the Court stated previously that it would impose the attorney fees

and costs also as against Plaintiff Redding, after further consideration and thought

I have determined that Plaintiff Redding should not be held financially responsible

for this attorney misconduct.

## V.    Conclusion and Orders.

The Montana Unfair Trade Practices Act provides that an "insurer may not be held liable under this section if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue." Mont. Code Ann. § 33-18-242(5).  Because under Montana law insurers are not found to be in bad faith if they have a reasonable basis for contesting a claim, NYM did not commit bad faith by declining to settle with Redding in February and March, 2011.  NYM conducted a reasonable investigation into Redding's claim and had a reasonable basis in law for declining to settle Redding's claim in February and March, 2011.  Redding's leveraging claim that NYM unreasonably refused to settle with her in order to force a global settlement is not supported by this record, which shows that it was the insured who wanted a global settlement, and Redding and all the claimants cooperated in achieving that goal.  NYM did pay $4 million to Deola, and there is no evidence in the record to support Redding's claim that NYM delayed paying policy limits ($4 million).  This case turned out to be a fishing expedition that yielded no catch.  NYM is therefore entitled to summary judgment on Redding's common law and statutory bad faith claims.

The Court has considered amounts requested by NYM for attorney fees and has decided that the total sum of $107,867.54, payable by Deola and Miller, jointly and severally, represents a fair and reasonable attorneys' fee and sanction.[8]

The Court may refer the question of attorney misconduct raised herein for further consideration by the judges of the District of Montana.

Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment (Doc. 251) is GRANTED. Plaintiff's First Amended Complaint is dismissed with prejudice, and all relief is denied to Plaintiff.

IT IS FURTHER ORDERED that Defendants' Motion for Fees and Costs (Doc. 285) is GRANTED to the extent that Plaintiff's counsel, Ms. Deola and Mr. Miller, shall pay to NYM the amount of $107,867.54.

IT IS FURTHER ORDERED that Defendants' Motion to Strike Plaintiff's Statement of Disputed Facts (Doc. 277) and any other pending motions are DENIED as moot.

The Clerk shall enter Summary Judgment in favor of Defendants and

---

[8] This is a substantial sum, but Plaintiff's counsel received over $1 million in fees for the Underlying Litigation, and defense counsel report that NYM has incurred more than $1 million to defend this case. Thus, the attorney fees are substantial on both sides.

against Plaintiff Redding, dismissing Plaintiff's First Amended Complaint with prejudice. The Judgment shall specify that Plaintiff's counsel, Ms. Deola and Mr. Miller, shall jointly and severally pay to NYM its attorney fees and costs in the amount of $107,867.54.

Done and Dated this 27th day of February, 2015.


CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE