

**FILED**

JUN 2 5 2015

Clerk, U.S. District Court
District Of Montana
Helena

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

HELENA DIVISION

| | |
|---|---|
| BILLIE L. REDDING, | CV 12–98–H–CCL |
| Plaintiff, | |
| vs. | |
| PROSIGHT SPECIALTY MANAGEMENT COMPANY, INC. aka MUTUAL MARINE OFFICE, INC. PROSIGHT SPECIALTY INSURANCE GROUP, INC. aka NYMAGIC, INC. and NEW YORK MARINE AND GENERAL INSURANCE COMPANY, | OPINION & ORDER (Motion for Attorney Fees and Costs) |
| Defendants. | |

Before the Court is Defendants' Motion for Fees and Costs Pursuant to the Court's Inherent Authority and 28 U.S.C. § 1927. The motion is opposed. The Court received all of Defendants' billing statements for *in camera* review on June 19, 2015.

1

Shortly after entry of the Court's Opinion and Order of February 27, 2015, there was a flurry of activity in this case, and even the lawyers lawyered up. Defendants filed a motion for $1.4 million in attorney fees. Attorney Ward Taleff made an appearance on behalf of Plaintiff's counsel Ms. Lin Deola and Mr. Brian Miller and filed on their behalf a notice of appeal and a motion for stay of enforcement of judgment against them, which latter motion was subsequently granted. Attorney Maxon Davis made an appearance on behalf of Plaintiff's counsel Richard Layne. Plaintiff's counsel Brian Miller and Richard Layne filed a notice of appeal on behalf of Plaintiff Redding. Attorney Jonathan McDonald filed a notice of appearance on behalf of Plaintiff Redding. All of Plaintiff's counsel filed an opposition to Defendants' request for attorney fees.

The filing of this motion for fees caused the other parties to respond with zeal but directed their attack as much to the court's summary judgment decision as to the question of fees. Both Ms. Deola and Mr. Miller filed self-serving affidavits and argument opposing fees and the summary judgment order now under appeal.

And just as Plaintiff's counsel surprisingly seem to have "doubled down" in

their positions, I am more convinced than ever that they have been and are still wrong on the law. Several months ago, the Court set forth a lengthy review of the facts of this case but at that time did not draw conclusions as to the appropriateness of Plaintiff's attorney conduct, which is now drawn into sharp question by the demand for attorney fees on the basis of vexatious litigation and bad faith on the part of Plaintiff's counsel.

Prior to this case, I have had some contact with Ms. Deola, and her performance before the Court was quite satisfactory. In fact, I admired her ability. I have had slight experience with Mr. Miller and certainly no problems. I have never seen Mr. Layne nor heard his voice and have no further information about him.

The filing of the attorney's fee demand by Defendants now requires the Court to decide whether fees should be granted to Defendants against Plaintiff and her attorneys. I have already refused to grant fees as against Ms. Redding and will not change that decision now. The issue then is whether fees should be awarded to Defendants as against Ms. Deola, Mr. Layne, and Mr. Miller, and their firms, if

applicable, and this compels the Court to determine whether Defendants' fees and

expenses have been enlarged, in whole or part, by bad faith, vexatious acts of

Plaintiff's counsel. Although the Court can award attorney fees, if at all, in this

bad faith case, a correct evaluation of all pertinent facts requires consideration of

all three phases of this litigation since they are inextricably intertwined.

I take no pleasure in this examination.

Legal Standards

Inherent Power Sanctions. The Court has the inherent power to assess fees

against a party and/or attorney when either has "acted in bad faith, vexatiously,

wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-

46 (1991). The Court's inherent power to police itself allows the Court to impose

sanctions when it "*specifically finds* bad faith or conduct tantamount to bad faith.

Sanctions are available for a variety of types of willful actions, including

recklessness when combined with an additional factor such as frivolousness,

harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d 989, 994 (9th Cir.

2001) (emphasis supplied). The Ninth Circuit panel held that "an attorney's

4

reckless misstatements of law and fact, when coupled with an improper purpose, such as an attempt to influence or manipulate proceedings in one case in order to gain tactical advantage in another case, are sanctionable under a court's inherent power." *Id.* Courts are admonished to exercise restraint and discretion in considering inherent powers sanctions, and "avoid using the wisdom of hindsight [when examining attorney conduct] by inquiring what was reasonable to believe at the time the pleading . . . was submitted." *Greenberg v. Sala*, 822 F.2d 882, 887 (9th Cir. 1987) (examining "errors in papers filed before an opportunity for discovery").

With sanctions under inherent power, the Court is able to make a party whole "for expenses caused by his opponent's misbehavior...." without resorting to the drastic sanction of contempt of court. *Id.* Under its inherent power, federal courts may sanction attorney conduct committed before another tribunal, such as a state court. *See Western Systems, Inc. v. Ulloa*, 958 F.2d 864, 873 (9th Cir. 1992) (citing *Chambers v. Nasco, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 2139, 115 L.Ed.2d 27 (1991)). "For purposes of imposing sanctions under the inherent power of the

court, a finding of bad faith 'does not require that the legal and factual basis for the action prove totally frivolous; where a litigant is substantially motivated by vindictiveness, obduracy, or *mala fides*, the assertion of a colorable claim will not bar the assessment of attorney's fees.'" *In re Itel Securities Litigation*, 791 F.2d 672, 675 (9th Cir. 1986) (quoting *Lipsig v. National Student Mktg. Corp.*, 663 F.2d 178, 182 (D.C. Cir. 1980) (per curiam)). Thus, under *Itel*, a party may be acting for an improper purpose "even if the act consists of making a truthful statement or a non-frivolous argument or objection." *Fink*, 239 F.3d at 992 (citing *Itel*, 791 F.2d at 675).

§ 1927 Sanctions. In addition, the Court may also impose sanctions against an attorney pursuant to statute when "[a]n attorney . . . multiplies the proceedings in any case unreasonably and vexatiously [so that the attorney] may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. A finding of subjective bad faith is required for imposition of section 1927 sanctions. *Kohler v. Flava Enters., Inc.*, 779 F.3d 1016, 1020 (9th Cir. 2015). Bad faith can be proven

by showing that "the attorney recklessly or intentionally misled the court" or "recklessly raised a frivolous argument which resulted in the multiplication of proceedings." *In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010). "[I]f a filing is submitted recklessly, it must be frivolous, while if it is not frivolous, it must be intended to harass.... [R]eckless nonfrivolous filings, without more, may not be sanctioned." *B.K.B. v. Maui Police Dep't*, 276 F.3d 1091, 1107 (9th Cir. 2002) (quoting *In re Keegan Mgmt. Co., Sec. Lit.*, 78 F.3d 431, 436 (9th Cir. 1996)). An argument that "lack[s] credibility on its face" is frivolous and may be sanctioned. *Id.* at 1107 n8. It must also be shown that the attorney's conduct has "multiplied the proceedings." For example, continuing to litigate after lack of merit has become clear results in unnecessary proceedings. *Edwards v. General Motors Corp.*, 720 F.3d 736, 738-39 (8th Cir. 2013) ("willful continuation of a suit known to be meritless"). Viewed objectively, an attorney's conduct must demonstrate intentional or reckless disregard of the attorney's duties to the court or to be so abjectly without merit that the court is justified in concluding that the attorney has "some improper purpose such as delay." *People of the State of N.Y. by Vacco v.*

*Operation Rescue Nat.*, 80 F.3d 64, 72 (2d Cir. 1996). The twin purposes of this statute are to compensate the victim of the misconduct and also to deter attorney misconduct. *Haynes v. City and County of San Francisco*, 688 F.3d 984, 987 (9th Cir. 2012) (citing *Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1205 (10th Cir. 2008) (sanctions awards are "victim-centered," as their purpose is to compensate a party for having to endure opposing counsel's abusive litigation practices)). A court may use a "straight fee recovery or a lodestar-limited recovery." *Hamilton*, 519 F.3d at 1206-07.

Background

We consider the facts and the law of this case in view of these standards to determine what Plaintiff's counsel knew or should have known about the merits of the case at the time they demanded payment of limits within 30 days. We first address the Montana law applicable in bad faith insurance cases. It derives from the United States District Court case of *Jessen v. O'Daniel*, 210 F.Supp. 317 (D. Mont. 1962), which was an automobile accident case, wherein the learned Judge W.J. Jameson held in a first-party bad faith case that an insurer acted in bad faith

by failing to settle a third-party claim within policy limits. In *Jessen*, the insured

wanted to settle the case within policy limits and offered to make a monetary

contribution to a settlement. However, the defense attorney failed to communicate

these facts to either plaintiff's counsel or the insurer, and as a result the case went

to trial and an excess judgment was rendered against the insured. Judge Jameson

looked to the rights and duties of the insurer and the insured under the insurance

contract, and began his analysis with the fundamental concept that

> [w]hen a liability insurance company *by the terms of its policy* obtains
> from the insured a power, irrevocable during the continuance of its
> liability under the policy, to determine whether an offer of
> compromise of a claim shall be accepted or rejected, it creates a
> fiduciary relationship between it and the insured with the resulting
> duties that grow out of such relationship. Under policies like those
> here involved, the insurer and the insured owe to each other the duty
> to exercise the utmost good faith. While the insurance company, in
> determining whether to accept or reject an offer of compromise, may
> properly give consideration to its own interests, it must in good faith,
> give at least equal consideration to the interests of the insured and if it
> fails so to do it acts in bad faith.

*Jessen v. O'Daniel*, 210 F.Supp. 317, 326 (D. Mont. 1962) (quoting *American*

*Fidelity & Casualty Co. v. G.A. Nichols Co.*, 173 F.2d 830, 832 (10th Cir. 1949)

9

(emphasis supplied)).

In 1977, the Montana Legislature enacted the Unfair Claims Settlement Practices Act, which provided a statutory framework for bad faith claims against insurers, and in 1983, in *Klaudt v. Flink*, 658 P.2d 1065 (Mont. 1983), the Montana Supreme Court held that third parties could file bad faith claims against insurers for breaches of the UTPA, MCA § 33-18-201. In 1984, the Montana Supreme Court adopted the *Jessen* factors when it held that insurance contracts imply the "obligation of good faith and fair dealing by a fiduciary bound by a duty of highest good faith." *Gibson v. Western Fire Ins. Co.*, 682 P.2d 725 (Mont. 1984) (first-party bad faith insurance case). The *Jessen* factors (to be considered on a case by case basis) include:

> (1) whether, by reason of the severity of the plaintiff's injuries, any verdict is likely to be greatly in excess of the policy limits; (2) whether the facts in the case indicate that a defendant's verdict on the issue of liability is doubtful; (3) whether the company has given due regard to the recommendations of its trial counsel; (4) whether the insured has been informed of all settlement demands and offers; (5) whether the insured has demanded that the insurer settle within the policy limits; (6) whether the company has given due consideration to any offer of contribution made by the insured. As a rule no one factor

10

is decisive. All must be considered in determining whether the insurer acted in good faith."

*Jessen*, 210 F.Supp. at 327.

In 1987, Montana enacted legislation to restrict bad faith claims by providing a single statutory cause of action for bad faith claims against insurers. Sec. 3, Ch. 278, L. 1987; MCA § 33-18-242. This statute provided an absolute defense for insurers with a "reasonable basis in law or in fact for contesting the claim or the amount of the claim whichever is in issue." MCA § 33-18-242(5). While a third-party claimant may bring a bad faith claim under the UTPA, MCA § 33-18-242(1), the Montana Supreme Court has also held that third-party common law claims for bad faith could still be brought against insurers. *Brewington v. Employer Fire Ins. Co.*, 992 P.2d 237, 240 (Mont. 1999).

*Jessen* and its Montana progeny clearly established that the insurance contract controls, and that it establishes the duties and their scope insofar as the insurer is concerned.

11

Distinguishing Factors

(1) No Unlimited Contractual Power to Settle Case. Our third-party case is absolutely factually distinguishable from the contracts in *Jessen* and most other Montana cases, in that the insurance contract in this case between NYM and AZ is a professional liability policy that withheld from NYM the exclusive right to settle claims *and* the insured AZ did not consent in writing (or otherwise) to settle with the third-party claimant at the time of the 30-day demand.

In this case, NYM by the terms of its policy did *not* obtain from AZ "*a power, irrevocable during the continuance of its liability under the policy, to determine whether an offer of compromise of a claim shall be accepted or rejected....*" *Jessen* 210 F.Supp. at 326 (quoting *American Fidelity & Casualty Co.*, 173 F.2d at 832) (emphasis supplied). NYM's power to settle was restricted to settlement only with AZ's written consent.

(2) Multiple Claimants. Additionally, the nature of the claimants is distinguishable. In this case, there were *multiple claimants known* to the insured (although their claims had not yet been presented). The fact of multiple claimants

was not speculative because the insured knew (before Redding even presented her claim) the names, addresses, and approximate damages of its clients whom they had referred for now-worthless TIC investments, and the insured had so informed the insurer before Redding presented the first claim. Of course the insured's files contained the identities of their clients who had potential claims and the amounts involved: they knew, obviously, that their client Thieltges Farms had invested $1,113,493, their clients, the Baileys, had invested $3,589,799, their clients, the Buckinghams, had invested $3,838,533, their client, Chevallier Ranch, had invested $1,587,730, and their client, Schindler Livestock, invested $1,587,730. There may have been other clients of AZ's, in addition.

(3) <u>Claims In Excess of Policy Limits.</u> The insured knew from its own records that the claims of the multiple claimants would be far in excess of its policy limits.

(4) <u>Claims Made and Reported Policy.</u> Also, the nature of the policy in this case is quite different from the typical Montana bad faith case. This was a "claims made and reported" policy, meaning that claims were required to be reported to the

insurer during the policy year (or within 60 days thereafter) applicable to the date the claim was presented to the insured. (Doc. 6-1 at 19, ¶ 1.1.) In this case, Ms. Redding's claim was presented to AZ within the 2008 policy year (9/30/08 to 9/30/09), and her claim was appropriately reported by the insured to the insurer within that year.

(5) Relation-Back Provision. Another dramatically important difference in this policy is that it had a *'relation back'* provision, referring to subsequent claims that arise out of covered acts "that are logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." (Doc. 6-1 at 25, ¶ 8.16.) The policy provides that when covered acts are reported to the insurer during a policy period "that may reasonably be expected to give rise to a Claim" then any subsequent claim "shall be deemed under this Policy to be a Claim made during the Policy Period." (Doc. 6-1 at 26, ¶ 9.1.) Because the insured did in fact report to the insurer during the 2008 policy year that it expected there might be multiple claims based on the insured's clients having purchased now-worthless TIC investments (Doc. 258-19, Claim/Incident Notification Form

dated 11/11/08), there was a real possibility that all such future claims would relate back to the first claim presented in the 2008 policy year (Redding's claim) and that all such claims would therefore be subject at most to the $2 million aggregate policy limit.

(6) <u>Coverage Exclusions.</u> So not only was this a unique professional liability policy (a) allowing no settlement without written consent of the insured, (b) requiring claims to be reported to the insurer during the policy year when the claim was made to the insured, and (c) relating back similar subsequent claims to that first policy year under its aggregate limit, *but also* this policy had an exclusion (or two or three) that might block coverage entirely. The policy excluded coverage for

-- deliberate misrepresentation,

-- intentional or knowing violation of law, or

-- criminal, dishonest, fraudulent or malicious act or omissions.

(Doc. 6-1 at 22, ¶7.1) The policy also excluded coverage

-- "for, based upon, or arising from [the insured's] capacity as a broker

or dealer in securities as those terms are defined in Section 3(a)(43) and 3(a)(5) respectively, of the Securities Exchange Act of 1983, or any amendment thereto...."

(Doc. 6-1 at 23, ¶ 7.11.) Given that Redding's Complaint alleged that AZ had violated the Montana Securities Act by acts that amounted to the sale of unregistered securities, this case involved claims for which there might be no insurance coverage whatever (regardless of the legal theory under which the claims were presented). AZ won this legal issue at the district court level on partial summary judgment, when on August 9, 2011, the state district court ruled that the TICs were not securities. This very issue was argued to the Montana Supreme Court by Plaintiff's counsel, Ms. Deola, on April 25, 2012, and the Supreme Court ruled in her favor (finding that the TICs sold to AZ's clients were unregistered securities) on July 5, 2012.

For over 18 months, from the filing of the Redding Complaint on July 27, 2009, to the $2 million policy limit demand made on February 17, 2011, Redding's counsel argued to AZ and NYM that Redding had established the first and only claim on the 2008 policy. Indeed, it was true that the five subsequent

claims were presented during the 2010 policy year or an extension of that policy year. While Redding's policy limit demand in February 2011 did not entitle her to immediate payment of the claim for a number of reasons, *viz.*, (1) the reasonable basis in law defense, (2) the lack of written consent by AZ, and (3) the potential applicability of policy exclusions, and perhaps other reasons, her demand did demonstrate that Redding was the first claimant to qualify under the 2008 policy. Because the 2010 policy contained the relation-back provision, potentially requiring all claims to relate back to the 2008 policy and its $2 million policy limit, the fact that AZ and the insurer subsequently agreed to the $4 million payment ($2 million for each of the 2008 and 2010 policies) is a concession by the insurer to agreement that the claims were "not related." In any event, although Redding was not entitled to immediate payment in February 2011, she did establish her claim (first and only) as against all other claimants to the 2008 policy and its $2 million policy limit (assuming coverage and compliance with all policy requirements).

Then when NYM agreed to pay and did pay $4 million under both the 2008

policy and the 2010 policy, it had to have done so only because the other claims were not "related claims." If they had been "related claims" all claims would have fallen under the 2008 policy for a total policy limit of $2 million. Of course, other claims would have had to meet their own timely-filed requirements. But the Redding claim was established as the first claim to the 2008 policy, and in view of subsequent developments it became the only claim to that policy completed and pending upon execution of the settlement agreement. The $4 million payment to Ms. Deola by NYM constituted full payment of all sums owing by NYM to Redding under the insurance contract.

Ms. Deola received $4 million into her trust account, and she therefore bore a legal duty to properly and correctly disburse the money. Ms. Deola told Redding (for the first time) about her other five client/claimants on June 5, 2012. (Doc. 259-14, Redding Depo. 95:12-17.) Ms. Deola asked Redding to accept a settlement of less than the $2 million due her under the 2008 policy and to release AZ from its excess liability. Ms. Deola would not hear of any release for NYM, even a mere release for her receipt of proceeds of the 2008 policy. Ms. Deola

asked Redding to accept a settlement of $681,696.96 (less $227,209.59 for attorney fees and $3,642.30 for costs), which had the result of giving the balance of the $2 million policy limit to Ms. Deola's other clients (and to Ms. Deola) and to one other claimant (Garrison Ranch). (Doc. 259-28.) It did not occur to Redding that she had a right to negotiate for a higher settlement, and, in fact, she now thinks she is suing NYM in the instant case because NYM "had not paid her bill." (Doc. 259-14, Redding Depo. 106:10-13, 148:3-10.)

Ms. Deola now claims that she had no choice but to divide the $4 million on a *pro rata* share basis, because counsel John Bloomquist demanded it. The Court notes that Bloomquist's client (Garrison Ranch) had almost the smallest investment out of all the seven claimants, and the Court is not persuaded that Bloomquist had, or should have been given, the power to decide how the settlement proceeds should be distributed. Apparently, neither Mr. Layne nor Ms. Deola even attempted to obtain the $2 million policy proceeds for Redding's claim that was established in February 2011.

Ms. Deola continues to argue that Redding was the first and the only

claimant to file as to the 2008 policy. If Ms. Deola had any doubt as to the propriety of distributing the $2 million proceeds to her other clients--and at the very least she should have been filled with doubt--she could have filed an interpleader with the court. Instead, Ms. Deola and Mr. Layne violated their duty of loyalty to Redding. This is highly relevant to the question of Mr. Layne and Ms. Deola's bad faith in filing and litigating this lawsuit.

The Court rejects completely Ms. Deola's argument that she was "only" local counsel in the underlying case. She signed and filed the original Complaint, she met with the client (Doc. 259-10, Deola Depo. I 9:3-7), she attended the mediation, she--alone--argued the case before the Montana Supreme Court, and she was the lead negotiator for the plaintiffs. Certainly Ms. Deola functioned at all times, at the minimum, as Mr. Layne's fully equal co-counsel in the underlying case against AZ. (*See* Local Rule 83.1(5) ("Local counsel must participate actively in all phases of the case....").)

However, the focus today is Mr. Layne and Ms. Deola's performance from the standpoint of the professional rules of attorney conduct. For purposes of

deciding the Defendants' motion for attorney fees *only*, the Court finds that Ms. Deola had a conflict of interest when she acquired multiple new clients to compete with her original client (Redding), who had previously established the only timely claim to the $2 million policy limit of AZ's 2008 policy. Ms. Deola has not currently demonstrated that *she* had obtained Redding's informed consent for the five new representations that she acquired, or that she made any effort to ensure that such informed consent had been properly obtained, but the Court doubts that any such consent would have been valid, in any event.

Ms. Deola's acquisition of multiple competing clients was a violation of the Montana Rules of Professional Conduct, Rule 1.7, in that there was a significant risk at the outset that the five additional clients--all unrelated to each other and to Redding--might easily be placed in the position of having to share in and compete with Ms. Redding's sole claim to the $2 million proceeds of the 2008 policy. Neither was it reasonable for Ms. Deola to believe that she could provide competent, loyal, and diligent representation to Redding and to each of the other five clients, all with competing claims, and certainly not on a theory that she could

make Redding whole by a future bad faith claim against NYM. Any such plan would constitute a wholly improper purpose for this suit.

This conflict of interest was made even more serious given that Ms. Deola had a personal financial interest in the disbursements of funds between Redding (14% attorney fee percentage) and her five newer clients (30-33% attorney fee percentage). "[S]ome conflicts are nonconsentable, meaning that the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent." Mont. Rules of Professional Conduct, Rule 1.7, comment [Prohibited Representations 14]. For example, "a lawyer may not represent multiple parties to a negotiation whose interests are fundamentally antagonistic to each other...." Mont. Rules of Professional Conduct, Rule 1.7, comment [Consent to Future Conflict 28]. The Oregon Supreme Court has held that "[i]t is never proper for a lawyer to represent clients with conflicting interests no matter how carefully and thoroughly the lawyer discloses the possible effect and obtains consent." *In re Conduct of Jans*, 666 P.2d 830, 833 (Or. 1983).

One type of non-waivable conflicts occurs when "[t]he lawyer represents an

opposing party in the same litigation" and another occurs when "[s]pecial circumstances render it unlikely that the lawyer will be able to provide adequate representation to one or more of the clients." Restatement (Third) of the Law Governing Lawyers, Sec. 202(2)(a), (c)). As to adversaries in litigation "[w]hen one client can prevail only at the expense of another of the lawyer's clients in the matter, the lawyer may not represent both. That rule applies even if the parties themselves believe that the common interests are more significant in the matter than the interests dividing them." Restatement (Third of the Law Governing Lawyers, Sec. 202, Comment g(I).

Moreover, if there were any doubt as to the non-waivability or nonconsentability of the conflict of interest resulting from Ms. Deola's obligations to Redding and her other five clients, that doubt is extinguished when taking into consideration Ms. Deola's disparate financial interests in their cases. No disinterested lawyer could believe that a client such as Redding should accept Ms. Deola's representation of five competing clients, especially when Ms. Deola's personal financial interest tilted overwhelmingly in favor of the competing clients.

The Court cannot justify Ms. Deola's conduct or Mr. Layne's tolerance of this situation. Of course, Mr. Layne did not participate in the fees generated by Ms. Deola's new clients but he apparently condoned her conduct.

Why would Ms. Deola do a complete about face and squander this rightful priority and claim of Ms. Redding? Why would Ms. Deola waive Ms. Redding's substantial right to the entirety of the 2008 policy and allocate to her only a *pro rata* share? Ms. Redding testified she had hoped to receive the entire $4.65 million settlement payment. Ms. Deola had exclusive control of the entire $4 million in insurance funds. It was in *her firm trust* account. She had the duty to disburse the funds in trust properly. It was her duty to consider all prudent courses of action. She could have refused to make any disbursement of funds that would not do justice to Redding. She could have filed an interpleader with the court. Hers was a high duty. Why did she not consider other alternatives?

One reason could have been because of the conflicting fee agreements she had with all but one claimant. Her fee agreements lead the Court to this undesirable and unavoidable conclusion: Ms. Deola received 14% of every dollar

she allocated for payment to her client of 3 years, Ms. Redding, but rewarded Ms. Deola with about 1/3 of every dollar she gave to her new clients. All this resulted in a fee of $1,215,631.00 to Ms. Deola and Mr. Miller's law firm. By denying Redding her proper proceeds of $2 million and subjecting her to the *pro rata* disbursement, Ms. Deola gained an additional $200,000 (approximately) in fees. Why would co-counsel Mr. Layne tolerate this? Ms. Deola also gained $935,000 in fees by taking on the extra clients. So the effect of all this on Ms. Redding, Ms. Deola's client of three (3) years, was to diminish Ms. Redding's net recovery by almost $700,000 and to waive for her any recovery on AZ's excess liability.

It is apparent that Ms. Deola, as counsel for most of the Plaintiffs, and Curt Drake, as AZ's general counsel, excluded NYM from their settlement negotiations. Was this a violation of NYM's rights under the policy? When Mr. Drake told Ms. Deola on June 3 and 4, 2012, that NYM was going to put up $4 million, defense counsel HagEstad had not even been consulted by Drake. (Doc. 259-4; HagEstad Depo. 134:23, 139:21-140:7.) It was a surprise to defense counsel HagEstad when Ms. Deola "accepted" AZ's $4.65 million offer on June 5,

2012. HagEstad told the NYM claims adjuster that Ms. Deola was accepting her own offer. (Doc. 259-4, HagEstad Depo. 138:18-22, 149:23-24.) Ms. Deola and Mr. Drake settled the case without the active participation of NYM, which was denied the right to participate in the drafting of the written settlement agreement. However, even though NYM was denied the right to participate in the settlement agreement, it nonetheless made the required payment of $4 million to the Deola/Miller trust account, under reservation.

In this case, submitted with the motion for attorneys fees, were two critical pieces of evidence of which the Court was completely unaware until the filing of the Defendants' claim for $1.4 million in fees: Exhibits B and D.

On January 30, 2014, defense counsel in this case sent a "meet and confer" letter to Ms. Deola (Doc. 311-2, Ex. B to Motion for Fees) that outlined the results of NYM's investigation of the case and the evidence and stated "it is not clear on what grounds plaintiff and her attorneys could, in good faith and in accordance with the provisions of Rule 11, continue to pursue this action against New York Marine." (Doc. 311-2.) Defense counsel requested that Ms. Deola promptly

identify what evidence supported plaintiff's claim of bad faith and confirm that plaintiff had produced all upon which she intended to rely. Ms. Deola did not respond to this letter (perhaps because she had recently been disqualified as trial counsel). On February 6, 2014, Mr. Layne responded in a letter consisting of four sentences. (Doc. 311-3.) Sentence two contended that the evidence was clear that NYM had refused to settle in February and March 2011 "after liability became reasonably clear" and that NYM improperly leveraged the July 2012 settlement with Redding by requiring other claims and claimants to settle. Sentence three informed counsel that "[w]e believe that the only thing left to resolve is damages." Thus, both Ms. Deola and Mr. Layne shrugged off and dismissed defense counsel's January 30, 2014, "meet and confer" Rule 11 letter.

On February 12, 2014, defense counsel sent a letter addressed to Mr. Layne, with a copy to Ms. Deola (Doc. 311-4, Ex. D to Motion for Fees), again requesting plaintiff's counsel to identify their evidence in support of Redding's bad faith claim against NYM and to confirm that all evidence had been produced. (Doc. 311-4.) Defense counsel again informed Plaintiff's counsel that "we are not aware

of any such evidence and do not believe that any such evidence exists." (Doc. 311-4.) Mr. Layne did not even respond to this letter!

It seems to the Court that such repeated, apparent good faith efforts by defense counsel cannot in good faith be dismissed out of hand. They establish a duty upon the reasonably prudent Plaintiff's counsel to the client, to opposing counsel, to the Court, and to the profession, to investigate, to carefully consider, and to provide a civil response. Failure to do so, in light of the other facts and law in this case, constitutes bad faith.

Other Acts by Counsel

The Court has examined the whole of counsel's conduct in this entire litigation, and considers the following acts to determine whether they are indicative, either individually or cumulatively, of bad faith and improper purpose.

(1) Ms. Deola asserted during the hearing on Defendants' motion for judgment on the pleadings that "in February or in March when the mediation was held, of 2011, . . . in fact, the insured was seeking to settle this case for policy limits." (Doc. 260-33, 5/14/13 Hearing Tr: 17:11-17.) Certainly that mistaken

statement has been corrected by the discovery in this case. Did Ms. Deola believe this statement of fact at the time she made this statement to the Court? On May 14, 2013, Ms. Deola's own common sense and reason should have decisively run in the opposite direction because AZ did not authorize such a settlement in writing, never expressed a desire for such a settlement, had not ratified Brad Condra's statement, and took no action to obtain such a settlement. In denying the motion for judgment on the pleadings, this Court considered Ms. Deola's misleading statement. Hers was a reckless misstatement of fact.

Ms. Deola filed this bad-faith insurance case when she knew or should have known that she would be a necessary witness in the case. She should not have tried to immunize herself from testifying by acting as counsel.

When the Court ordered that Ms. Deola sit for a deposition, she threatened to not cooperate with opposing counsel in her upcoming deposition, going so far as to assert that she "was likely to answer very few questions and [was] prepared to be held in contempt if necessary." (Doc. 217 at 4.) During her first deposition Ms. Deola frequently could not remember information or simply did not know

information that she could have or should have known by simple review of her case file.

(2) Ms. Deola collaborated in the underlying litigation with AZ's general counsel, Curt Drake, allowing Mr. Drake to name three of her clients (Redding, Thieltges, Chevallier Ranch Co.) as nominal defendants in AZ's coverage lawsuit against NYM, filed on December 28, 2011. *See Anderson ZurMuehlen & Co., P.C. v. New York Marine & General Insurance Company, et al.*, DDV-2011-942, Montana First Judicial District Court (Lewis and Clark County). Ms. Deola relied upon her opposing counsel (AZ's general counsel, Curt Drake) to tell her what insurance coverage was available. (Doc. 259-10, Deola Depo. I, 125:17-126:5.) Ms. Deola and Mr. Layne made no effort to press Redding's claim against AZ for excess liability above the $2 million policy limit.

Ms. Deola began to negotiate privately with Mr. Drake for a stipulated judgment by AZ in a "hefty" amount in exchange for a covenant not to execute on AZ's assets and an assignment of AZ's first-party rights against the insurer--at the same time that Ms. Deola was also engaging in formal settlement negotiations

with AZ's defense counsel. (Doc. 265-3 at 5; Doc. 259-10, Deola Depo. I, 101:10-12, Ex. 77.)

(3)     In the underlying action, in February 2011, Mr. Layne gave a short deadline (30 day) for a policy limit demand, at a time when calculation of Redding's damages was not complete, substantial legal issues in the case were unresolved, and the existence of coverage was in genuine and substantial dispute. When defense counsel requested a six-day extension of time to respond, Mr. Layne refused to extend the 30 days.

Mr. Layne chose to overlook Ms. Deola's representation of other clients, and he accepted an unfavorable settlement for his sole client, Redding. He now appears as co-counsel and in this case against the insurer. Mr. Layne has supported this litigation from the beginning, he is a co-leader and a full participant in it, and he is as fully responsible for it as Ms. Deola and Mr. Miller.

(4)     In October, 2013, NYM counsel informed Ms. Deola that they were preparing to file a motion to disqualify her as trial counsel (due to the fact that she was a necessary witness). Just minutes later, Ms. Deola emailed a threat that she

would file a responsive motion to disqualify opposing counsel. As promised, Mr. Miller did file that retaliatory motion later. The Court denied the motion and stated that "[t]he motion to disqualify Mr. Goodman seems patently frivolous...." (Doc. 237 at 3.) It was clearly a retaliatory motion. In addition, in July, 2014, Mr. Miller filed a frivolous motion for recusal.

(5)     Mr. Layne, Ms. Deola, and Mr. Miller decided to continue litigating Redding's claims long after the lack of merit became clear. Defense counsel sent Mr. Layne the second Rule 11 letter on February 12, 2014, and Mr. Layne did not bother to answer it. Two days later, on February 14, 2014, an AZ executive testified that AZ did not want to settle with Redding when she made her policy limit demand in February 2011 and never authorized a settlement with Redding until June, 2012 (Doc. 259, Carlson Depo. I, 62:22-63:1). There simply is no evidence in this case that AZ was willing to settle with Redding for policy limits or, more importantly, authorized in writing any settlement with Redding prior to 2012, as was required by the insurance policy. For Mr. Miller to continue to argue otherwise to this day underscores the unreasonableness of his current position. It

would have been sheer lunacy for AZ to consent to a policy limits settlement with Redding--which it did not do. It would have been a violation of the insurer's duty of good faith to the insured to have paid out the entire policy limit to one claimant without the written consent of AZ, when both AZ and the insurer knew that more claimants would be filing claims and that the new claims could very well have related back to Redding's policy. Moreover, as fully explained in the Court's summary judgment decision, the insurer was also not required to settle the case when it had a reasonable basis in law defense *and* the existence of coverage was still in question. *See State Farm Mut. Auto. Ins. Co. v. Freyer*, 312 P.3d 403, ¶54 (Mont. 2013) ("Without coverage, a duty to settle does not arise, even if the facts of the accident indicate that the insured's liability, i.e., her negligence is reasonably clear.") (citation omitted).

(6) Almost one year ago, on July 2, 2014, this Court denied Defendants' request for a contempt order against Plaintiff's counsel but ordered that attorney fees be assessed against Ms. Deola and her firm for discovery violations. In that order, the Court stated that Ms. Deola provided "evasive or incomplete disclosure"

(Doc. 262 at 5), that she improperly redacted a document "to annoy or harass opposing counsel" (Doc. 262 at 7), that other discovery was produced "in an untimely and inadequate fashion" (Doc. 262 at 7), that Plaintiff's counsel had misstated the Court's prior ruling and engaged in "self-serving rationalization" (Doc. 262 at 12-13), that she did "delay and obstruct the progress of discovery" (Doc. 262 at 20), and that her "failure to cooperate in discovery was not substantially justified" (Doc. 262 at 24). Moreover, the Court stated that the only reason these discovery violations were uncovered was because a third-party subpoena "produced numerous relevant non-privileged emails written to or from Ms. Deola herself that she had failed to produce (1) in a timely manner, or (2) appropriately unredacted, or (3) at all." (Doc. 262 at 14.) All of this, plus Ms. Deola's "generally half-hearted efforts to cooperate with opposing counsel in the discovery process" resulted in Ms. Deola being required to sit for a second deposition. (Doc. 262 at 15.) That second deposition was held in the courtroom so that I could rule on Plaintiff's objections, but none were made. A sanction of attorney fees for these discovery violations has previously been imposed, but the

Court reviews them here as part of the litigation context.

<u>Analysis and Findings</u>

The Court's inherent power to police itself requires that such power be exercised with restraint and discretion. Ms. Deola's statements to the Court in open court, on the record, on May 14, 2013, contained a reckless misstatement of fact. Mr. Miller's motion to disqualify opposing counsel was a retaliatory motion. Rule 11 letters were ignored. Based on all the record in this case, the Court finds that Ms. Deola, Mr. Layne, and Mr. Miller did act in bad faith and vexatiously (1) by continuing this litigation after the lack of merit was plain, (2) by wrongfully attempting to set up the insurer for this bad faith lawsuit, (3) in order to cover up and to justify their earlier wrongful distribution of monies in trust, and (4) by intentionally or recklessly misstating the facts and/or the law for improper purposes during the course of this litigation. These acts multiplied the proceedings, showed disrespect for the Court's resources, harassed opposing counsel, and caused unjustified additional expense to Defendants.

Plaintiff's counsel and their law firms ought to be sanctioned under the

35

Court's inherent power. The Court notes that the original complaint in this case was filed by Ms. Deola and her firm and signed by her and the firm. Mr. Layne is apparently a solo practitioner located in Portland, Oregon.

The Court has considered whether a sanction under 28 U.S.C. § 1927 is adequate to address the cumulative nature of counsels' misconduct, and the Court finds that the statute alone is not adequate for that task. The individual instances of questionable attorney conduct in this case appear to have been part of a larger litigation scheme serving an improper purpose. The Court finds that the requirements for § 1927 sanctions have been met.

Finally, there is other currently pending litigation filed by AZ that bears upon these fees. It is worth remembering at this juncture that AZ set all these events in motion when it harmed its long-time, trusting client, Ms. Redding, as well as other clients. That initial harm was compounded by the fact that AZ was greatly underinsured. NYM rightfully defended under reservation of rights because coverage was unclear. AZ therefore sued NYM in a coverage action that was heard by this Court, and AZ settled that action with NYM by means of a

settlement agreement. AZ later sued NYM again to clarify or set aside this settlement, and NYM has counterclaimed for breach of the insurance contract. In short, this second suit by AZ against NYM could potentially result in a judgment in favor of NYM against AZ for damages, the measure of which could consist of fees paid by NYM in the instant case filed by Plaintiff Redding. Of course, this action is still pending. *See Anderson ZurMuehlen & Co., P.C. v. New York Marine and General Ins. Co.*, CV 14-33-BU-SEH.

Conclusion

Having made the appropriate findings, the Court concludes that sanctions should be imposed in a reasonable amount. Counsel have caused Defendants to incur unjustifiable expenses by their bad faith, intentional, reckless, and frivolous conduct committed for improper purposes. The Court will impose a sanction consisting of the amount that NYM paid to defense counsel as fees and costs for services and expenses after February 14, 2014, which is the date when AZ's Carlson testified that AZ did not authorize settlement with Redding when her counsel made the 30-day policy limit demand. Accordingly,

IT IS HEREBY ORDERED that Defendants' Motion for Attorney Fees is GRANTED. For this bad faith and vexatious conduct, the Court hereby sanctions Richard M. Layne, Linda Deola, Brian J. Miller, and the firm of Morrison, Sherwood, Wilson, & Deola, PLLP, jointly, in the amount of $515,119.90, payable to NYM. This represents reasonable restitution in light of the unjustified, unnecessary, and extraordinary expense suffered by NYM. The Clerk shall enter an Amended Judgment incorporating therein the content of the existing Judgment in this case dated February 27, 2015 (Doc. 305), and adding thereto the following:

> IT IS FURTHER ORDERED AND ADJUDGED, Defendants' Motion for Fees and Costs (Doc. 309) is granted to the extent that Richard M. Layne, Linda Deola, Brian J. Miller, and the law firm of Morrison, Sherwood, Wilson, & Deola, PLLP, are jointly indebted to and shall pay to NYM the sum of $515,119.90.

Execution is hereby stayed pending further order of this Court.

Dated this 25th day of June 2015.

CHARLES C. LOVELL
SENIOR UNITED STATES DISTRICT JUDGE